[Civ. No. 14210. First Dist., Div. One. Dec. 21, 1949.]

RHODE ISLAND INSURANCE COMPANY (a Corporation), Petitioner, v. WALLACE K. DOWNEY, Individually and as State Insurance Commissioner, etc., et al., Respondents.

222

Peart, Baraty & Hassard and Bronson, Bronson & McKinnon for Petitioner.

Fred N. Howser, Attorney General, T. A. Westphal, Jr., and Harold B. Haas, Deputy Attorneys General, for Respondents.

BRAY, J.—Petition for a writ of mandate directing the superior court to vacate its "Order Appointing Conservator and Restraining Order" in a proceeding brought against petitioner by respondent Insurance Commissioner of the State of California. The questions involved concern the validity of the acts of respondent in seizing, by virtue of said court order, the California business and assets of the petitioner.

## RECORD

On May 17, 1949, said commissioner filed an application in the superior court under section 1011 of the Insurance Code, for an order making him conservator of the petitioner, directing him to take possession of all of its assets, records, and property, vesting title thereto in him, and enjoining it from transacting further business in California, etc. The application as permitted by section 1011 of the Insurance Code, was made ex parte and without notice. The order was granted forthwith. The application and order were served upon petitioner simultaneously with the seizure by the commissioner under the order, of all of its California assets. On June 1, petitioner filed its petition in this court for a writ directing the superior court to vacate its order. Respondents demurred to the petition on the ground that it does not state a cause of action against them and also filed returns. Later petitioner filed a supplement to the petition and then an amendment thereto. Respondents filed demurrers and answers to the petition and to the supplement and amendment. The case was submitted on the pleadings and the briefs, it being the petitioner's theory that the pleadings, together with certain admissions claimed to be made in the briefs and on the argument, show as matter of law that the commissioner had no legal right to seize the company as he did.

PLEADINGS

The material allegations of the complaint as supplemented and amended may be summarized as follows:

Petitioner was organized under the law of Rhode Island, is lawfully doing business in 34 states, a number of foreign countries and territories, and has been duly licensed to do business in California since 1912. Wallace Downey is the duly appointed Insurance Commissioner of California.

As of December 31, 1948, petitioner's total assets exceeded the total liabilities (excluding capital and surplus) by about two and one-half million dollars. After deducting certain nonadmitted assets, there was still a capital stock of one million dollars and a surplus of over one million dollars. During 1948, petitioner wrote insurance in gross premium value of about thirteen million dollars, and about one and one-half million dollars in California alone. Business in California has shown a healthy increase. Petitioner has 142,000 policies in force in the state, and is represented by over 2,500 duly qualified and licensed agents.

The superior court order appointed the commissioner conservator of petitioner's business, gave him title to its assets "wheresoever situated," and restrained petitioner from carrying on its business. The commissioner, on taking over, has prohibited the issuance of any further policies in California, and, in effect, has stopped petitioner from doing business here.

The grounds given by the commissioner in his application are all disputed by petitioner, and it is contended that for more than a year most of them were known to him. They rest on the determination of legal questions, accounting problems, questions of valuation of assets, and similar questions, all of which are debatable. On many of these issues the commissioner has a difference of opinion with 33 other state insurance commissioners. The only recent development is in connection with an agreement between petitioner and Pioneer Equitable Insurance Company of Indiana, dated March 21, 1949. This agreement was approved in March by the Insurance Commissioner of the State of Rhode Island, petitioner's domiciliary state, and the Insurance Commissioner of the State of Indiana, Pioneer's domiciliary state.

The commissioner's interpretation of that agreement is that (a) it amounted to a merger or consolidation without the commissioner's consent (the company denies that it does or that the commissioner's consent can be required); and (b) it would

cause a properly adjusted financial statement to show the company's capital impaired approximately 73 per cent. This causes a technical, statutory insolvency, and is based on determinations opposed to those of the insurance commission- ers of the domiciliary and other states. The commissioner concedes that there is an excess of assets over true liabilities, so that no actual insolvency exists. The liability of petitioner to Pioneer as of January 1, 1949, for the retirement of preferred stock in the amount of $1,500,000 is by a resolution of the stockholders of Pioneer held March 29, 1949, made subordinate to the rights of the policyholders, creditors and claimants, and if petitioner shall be in arrears in providing for the redemption of the Class A preferred stock in an amount equivalent to two years cumulative redemptions, the stockholders of Class A preferred stock voting as a class shall be entitled to elect a majority of the directors of the corporation.

From August, 1948 on, the commissioner had conferences with officers and attorneys of petitioner regarding matters of internal management making various complaints about the management and asking the company to withdraw from business in California. Further conferences were held. Although petitioner did not believe the commissioner had power to demand internal changes, it made several of the requested changes—put in directors who were not employees, cut down the volume of its business, adopted a policy of investing only in securities traded on a national exchange, etc. Petitioner did not remove Stewart Hopps, chairman of the board, from his position as officer and director, as suggested by the commissioner, but transferred power from the chairman of the board to the president. The commissioner, although not contending he had the right to insist on such change, still insisted Hopps should be eliminated entirely.

Early in November, 1948, the commissioner met in New York with the insurance commissioners of Rhode Island, Pennsylvania and Indiana, and some officers of petitioner. This was followed by a meeting of the insurance commissioners alone, who took no action nor did any of the commissioners in other states.

On November 8, petitioner received a letter from the commissioner purporting to require it to cease business in California. Under authority given in the Insurance Code, petitioner asked the Attorney General of California for an opinion as to the legality of the commissioner's order in the

November 8 letter, and was later advised that the commissioner's order had been withdrawn. On November 18, petitioner filed in the superior court an application for declaratory relief against the commissioner, seeking an adjudication of status and legal relations under the Insurance Code, and an injunction restraining the commissioner from interfering with the company's business pending final adjudication. An order to show cause for a preliminary restraining order issued November 18, returnable November 26. It was continued from time to time by mutual consent, and was to be heard on June 13, 1949.

Immediately after the declaratory relief action had been filed by petitioner, the commissioner, under authority of the Insurance Code, began investigating petitioner. Hearings were held in New York and petitioner's books were examined in Philadelphia. Hearings were adjourned on December 23d, for the Christmas holidays, on the understanding that they would be resumed again on notice from the commissioner. On February 23d, the Attorney General of California wrote petitioner about completing questioning of officers. The company replied that they would be available in about one week. The attorney general made no objection and was to notify petitioner of the date. No further word was received from the attorney general or the commissioner, and no further request for resumption of the investigation was ever received by petitioner.

The National Association of Insurance Commissioners is an organization of all state insurance commissioners, having as one purpose to secure uniformity of insurance regulation among the states. At the convention of the N. A. I. C. in New York in December, 1948, the commissioner made a motion that the executive committee, of which he was a member, act together in the matter of petitioner. The motion was not seconded. On January 17, 1949, the commissioner advised the N. A. I. C. that he did not desire to act alone and requested the N. A. I. C. to join in uniform action. The commissioner was thereafter advised that the N. A. I. C. suggested a "convention examination," conducted by examiners from state insurance departments, one examiner from each zone in which the company does business. For the purpose of these examinations, the United States is divided into six zones. Such examinations are made of all insurance companies as often as required by the law of the domiciliary state. Rhode Island requires such an audit every four years. The last examination

of petitioner was in 1945. California is in zone 6, and the commissioner accepted the invitation to be the examiner representative of that zone.

The convention examination and audit of petitioner began on May 2, 1949. On May 10th, the commissioner notified the convention examiners that he would advise regarding his participation at the earliest moment. To date no representative of the commissioner has appeared to participate in the audit, although it has been going on for a month by the representatives of the other five zones, and will be finished in about 90 days.

On May 17th, one week after the commissioner communicated with the convention examiners, the commissioner filed his application for a conservator. The commissioner stated to the trial judge that application had to be made *ex parte* because if notification were given, petitioner would have a chance to withdraw all of its assets from California, and that petitioner's agent in California would pay it money due for premiums.

As an example of the determinations from which the commissioner drew a conclusion of hazardous condition of the company the report (Exhibit A) questioned a receivable due petitioner from the U. S. Interstate Brokerage Corporation in the sum of $923,761.45 as of September 30, 1948, although as of December 31, 1948, the date given to the audit, said receivable had been reduced to $139,873.89 and to $24,039.19 at the date of the seizure, and the commissioner knew or should have known these facts. In writing off a reinsurance commission receivable from Lloyds on the reinsurance contract petitioner claimed it should be based upon a 25 per cent commission, whereas, for the reasons there set forth, the commission basis should have been 44.6 per cent. The write-down by the commissioner was $616,589.79 when it should have been only $53,351, and the commissioner acted arbitrarily and unreasonably in making such write-down.

At the time of filing his application, the commissioner knew (a) that petitioner's agent in California forwards premiums to petitioner monthly, as they are collected from subagencies; (b) that on May 17th, the agent held only about $45,000 due petitioner; (c) that premiums receivable for the 60-90-day period preceding May 17th were in an amount less than $200,000, and that only 50 per cent or less of that would be paid agents, due to a notice sent by the commissioner to all agents and brokers; (d) that the commissioner would come into possession of only $145,000 or less, and that petitioner has

little or no other assets in California; (e) that the assets to be received by him "were at least $300,000 less than the amount required to pay the normal losses on insurance in force, without taking into consideration any provision for return premiums on policies which would be cancelled as a result of the commissioner's action and also without taking into consideration the expenses of his administration. Of $1,300,000 unearned premium reserve on California insurance in force at least $450,000 would be paid out in losses in the normal course."

The commissioner's determination that continuation of business in California would be hazardous is highly debatable and in conflict with the determination of 33 insurance commissioners and convention examiners from Florida and Rhode Island who have signed affidavits that they do not believe the company to be on the verge of insolvency. The commissioner, on May 17th, notified the 2,500 agents of the company and Pioneer Equitable, and all brokers, about 7,500 in number, that he was taking the company over in this state; that no further business was to be written with the company, and that he was going to audit all accounts of agents and brokers. Petitioner is ready, willing and able to pay all losses for which it is now liable to residents in California, and to pay the return premiums on any policies cancelled by residents, but is prevented from so doing by the commissioner and the court's action. The commissioner, owing to the fact that the main assets of petitioner are in Rhode Island, cannot rehabilitate it in this state; he can only liquidate, or force it to discontinue business here. The seizure has caused petitioner irreparable injury.

Attached to the petition for a writ of mandate is the application of the commissioner for the superior court order appointing him conservator, which had attached to it Exhibit A, which is a report or audit of petitioner dated April 22, 1949, made by the commissioner's auditor, purporting to show the condition of petitioner as of December 31, 1948, and which is the basis upon which the commissioner claims his right to act. This audit shows petitioner to be insolvent within the meaning of article 13, chapter 1, part 2, division 1 of the Insurance Code.

Respondents' answer denied the allegations of the petitioner as to the action of the commissioner being arbitrary, unreasonable, and in abuse of his discretion, or that he had knowledge of the matters which petitioner claims differs from those shown in the audit.

## CONTENTIONS

Petitioner's principal contentions are (1) that the circumstances as known to the commissioner on May 17th did not justify a seizure of petitioner in California, without a previous hearing, and therefore the commissioner acted arbitrarily in so doing; it denies the correctness of the report and contends that neither the report nor the circumstances known to the commissioner justified a seizure without a preliminary court hearing; and (2) that because it claims that petitioner has no adequate remedy to show that the seizure was arbitrary, not made in good faith, and unnecessary, the statute permitting such seizure is unconstitutional, or if constitutional, has been applied in an unconstitutional manner; that while the question of petitioner's condition is being threshed out in court, it should be permitted to possess and operate its business.

## URGENT EMERGENCY

██ Petitioner contends that section 1011 authorizes the court to make the conservator order without notice *only* in situations of urgent emergency. There is nothing in the section which justifies this interpretation. The section provides: "The superior court . . . shall, upon the filing by the commissioner of the verified application showing any of the following conditions hereinafter enumerated to exist, issue its order [similar to the one made in this case] . . . (c) That such person, without first obtaining the consent in writing of the commissioner, has transferred, or attempted to transfer, substantially its entire property or business or, without such consent, has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person. (d) That such person is found, after examination, to be in such condition that its further transaction of business will be hazardous to its policy holders, or creditors, or to the public . . . (j) That the last report of examination of any person to whom the provisions of this article apply shows such person to be insolvent within the meaning of Article 13, Chapter 1, Part 2, Division 1 of this Code."[1]

---

[1]It may be noted here that petitioner is making no point of the failure of the commissioner to comply with section 1038 which provides that any application under section 1011 "shall be served upon the person named in such application in the manner prescribed by law for personal service of summons . . ." —probably because *Neblett* v. *Pacific Mutual L. Ins. Co.*, 22 Cal.2d 393 [139 P.2d 934], holds that notice is not essential.

This contention is closely related to its argument that because the commissioner was aware of most of the matters complained of some time back he should not have used the procedure provided by the statute, without a hearing either before the commissioner or the court. Similar contentions have been heretofore considered by the courts and denied. In *Caminetti* v. *State Mutual Life Ins. Co.*, 52 Cal.App.2d 321 [125 P.2d 165], the court said (p. 325-6) : "Appellant presents the further argument that the state is estopped from taking over this insurance company because the commissioner and his predecessors in office knew of the practices which the commissioner determined, and the court in this proceeding concluded, to be hazardous; that, knowing of these practices in years gone by, the commissioner failed to take over the company and permitted it to continue its business.

"To state the contention is to state its impossibility. To govern themselves, the people act through their instrumentality which we call the State of California. The State of California functions through persons who are· for the time being its officers. The failure of any of these persons to enforce any law may never estop the people to enforce that law either then or at any future time. It would be as logical to argue that the people may not proceed to convict a defendant of burglary because the sheriff perhaps saw him and failed to stop him or arrest him for another burglary committed the night before."

The statute itself does not limit its use to times of sudden emergency. The statute, as construed by the California courts, requires only that the commissioner file a verified application stating that he has found one, or more, of the statutory grounds to exist. "In making his application under section 1011 of the Insurance Code, *the commissioner does not seek a judicial appointment and a judicial ruling that the company is in fact delinquent.* By his application the commissioner merely represents that he has found certain conditions to exist and has made his official administrative determination to proceed as authorized by the statute. In obtaining his original ex parte order, *the commissioner is not required to show* to the court *that the company was in fact in a hazardous condition,* but only that he, as a state officer, invested by legislative authority with the power, has so 'determined' and 'found.' The Insurance Code provides that the order or determination of the commissioner to take over the affairs and assets of the company shall continue in force and effect until, upon application by either the commissioner or of the company, it shall

appear to the court, after a full hearing, that the ground for said order does not exist or has been removed and that the company can properly resume title to and possession of its property and the conduct of its business." (*Caminetti* v. *Imperial Mut. L. Ins. Co.*, 59 Cal.App.2d 476, 487 [139 P.2d 681]; emphasis added.) Under section 1011 nothing is required beyond the good faith determination by the commissioner of the existence of one of the conditions enumerated in the section.

Petitioner has emphasized that the matters involved were disputable. It is not a requirement of the statute, however, that such matters not be disputable. The Legislature undoubtedly assumed that in most cases the company involved would dispute the commissioner's contentions, and accordingly provided, in section 1012, for a full hearing before the trial court, at which the company could show that the conditions claimed by the commissioner did not exist. There is no implied restriction in the statute that the commissioner act only where the existence of the dangerous condition is beyond dispute.

That the company's contention that an emergency must exist is not well founded is further shown by the provisions of section 1013 of the Insurance Code, which provides for a seizure by the commissioner without any hearing or any court order. It reads: "Whenever it appears to the commissioner that any of the conditions set forth in section 1011 exist or that irreparable loss and injury to the property and business of a person specified in section 1010 has occurred or may occur unless the commissioner so act immediately, the commissioner, without notice and before applying to the court for any order, forthwith shall take possession of the property, business, books, records and accounts of such person, and of the offices and premises occupied by it for the transaction of its business, and retain possession subject to the order of the court. . . ."

Section 1012 provides for a hearing in case of seizure either under section 1011 or 1013: "Said order shall continue in force and effect until, on the application either of the commissioner or of such person, it shall, after a full hearing, appear to said court that the ground for said order directing the commissioner to take title and possession does not exist or has been removed and that said person can properly resume title and possession of its property and the conduct of its business."

In *Caminetti* v. *Guaranty Union Life Ins. Co.*, 52 Cal.App. 2d 330 [126 P.2d 159], the court discusses the term "hazardous" as used in section 1011(d) and holds that even though an insurance company can be solvent its condition may still be hazardous and justify the seizure by the commissioner. The court said (p. 332) : "The company was solvent; it had grown under the family management; but the commissioner determined, and the court approved his determination, that the withdrawal from the funds of the mutual policyholders of these monthly salaries made it hazardous for it to continue in business. . . .

"Did the withdrawal of these funds constitute a hazardous condition as defined by the Insurance Code? To follow to its conclusion appellant's argument that there could be no hazard to policyholders so long as the business is solvent, would be to sanction the withdrawal of policyholders' money in the payment of excessive salaries without restriction. This is not the law. Excessive withdrawal of policyholders' funds continued long enough will eventually render any company insolvent, and thus destroy the very purpose of the payment of insurance premiums. The people of the state and interested policyholders have a vital interest in this. *There is no requirement of our Insurance Code that the Insurance Commissioner must wait until an insurance company is insolvent* before he takes action to protect the policyholders. To so hold would be to apply the ancient aphorism about locking the barn door after the horse is stolen. . . .

". . . If the management of the insurance company so conducts its business that there is loss, *or risk of loss* to the policyholders, it becomes the duty of the Insurance Commissioner to take possession of the company's assets and to conduct its business as conservator. This is the meaning of the word 'hazardous' as used in the statute." (P. 333; emphasis added.)

Petitioner contends that because the company was in a position "to make available within a reasonable time sufficient moneys to meet promptly any demand which might in the ordinary course of events be properly made against" it (Ins. Code, § 706.5), the commissioner was not entitled to proceed under section 1011. However, under the Insurance Code a company may be in that position and yet be insolvent. Such was the situation in *Carpenter* v. *Pacific Mut. Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761]. It must be remembered that insurance companies, like banks and building and loan com-

panies, are charged with a public interest, and hence, the price of doing business is the fact that whenever a condition exists which the insurance commissioner feels is hazardous, he may take over the company and the question of whether he was justified in doing so is thereafter threshed out. "It is no longer open to question that the business of insurance is affected with a public interest. The state has an important and vital interest in the liquidation or reorganization of such a business. [Citing cases.] Neither the company nor a policyholder has the inviolate rights that characterize private contracts. . . . Sections 1010 et seq. of the Insurance Code deal with rehabilitation and liquidation of insurance companies in financial difficulties, and with the reinsurance of their business. This phase of state control is extremely important. Insurance is a public asset, a basis of credit, and a vital factor in business activity. Obviously, if an insurance company gets into financial difficulties, something must be done to remedy the situation. Either the company must be liquidated, and its assets distributed to its creditors, thus immeasurably injuring many of its policyholders who are thus deprived of insurance protection, or the business must, if possible, be rehabilitated. The public has a grave and important interest in preserving the business if that is possible. Liquidation is the last resort." (P. 329.)

In *Andre* v. *Beha* (1925), 211 App.Div. 380 [208 N.Y.S. 65], the New York superintendent of insurance had taken over the assets of a Russian insurance company. Plaintiff there made the same contentions of irreparable loss and injury as are made here, and also the contention that the company was actually solvent. In refusing plaintiff's application for relief the court said (p. 79 [208 N.Y.S.]): "The Attorney General, in his first point, argues that the proper procedure in this case calls for action on the part of the superintendent of insurance under section 63 of the Insurance Law (see McKinney's Consol. Laws and Supp.), which, he says, provides an exclusive remedy for the protection of the corporation and its shareholders. The plaintiff claims that this section has no application to a solvent company, which, he says, is the case here. I cannot agree with the learned counsel for the plaintiff in his narrow view of the section. It is not only insolvency that is made the basis for action on the part of the superintendent, but under the section he may act where the company is found, after an examination, to be in such a condition that 'its further transaction of business will be hazardous to its

policyholders, or to its creditors, or to the public.' See Insurance Law, sec. 63 . . .

"In construing this very section of the law, the Court of Appeals in a recent case (*Matter of People* [*City Eq. Fire Ins. Co.*] 238 N.Y. 147, at page 156, 144 N.E. 484, 486) said:

" 'The superintendent is not, therefore, to take possession of the property solely for the benefit of creditors or policyholders in this state or in the United States, but for the interest of all its policyholders, creditors, and stockholders wherever they may be.' "

Petitioner has cited, and we have found, no case involving insurance companies, banks or building and loan companies, affected, as they are, with a public interest, supporting the position it takes with reference (1) to necessity for urgent emergency; (2) abuse of discretion in selecting the remedy under similar circumstances; (3) or requirement for hearing before seizure.

Petitioner refers to the insolvency as a "technical" one. The code has defined "insolvency." It has fixed the 75 per cent figure as a minimum figure below which it is dangerous for a company to go. The impairment of capital shown in Exhibit A is approximately 73 per cent. Section 981 of the Insurance Code provides that when the impairment (as defined therein) falls below 75 per cent of the aggregate par value of its issued stock, an insurance company is insolvent. Thus, the apparent impairment amounts to approximately 48.5 per cent of petitioner's stock par value. It is therefore considerably below what the state has determined to be a safe point. Coupled with the fact that the company appears to have been losing over one million dollars per year for the past three years, and has changed in that time from a company with ample capital and surplus to one having no surplus and an impaired capital[1], it cannot be held to be strictly a technical situation. In *North American Building & Loan Assn.* v. *Richardson,* 6 Cal.2d 90 [56 P.2d 1221], the court rejected a similar contention concerning the impaired capital of a building and loan association. There the statute allowed taking over, if the commissioner found that capital was impaired *to any extent,* and the court rejected the argument that this

[1]Wherever in this opinion we have referred to the financial condition and conduct of the business of the company, we are referring merely to the situation as it appears in the report and are not holding that such situation actually exists. To determine that fact will require a long hearing, for which the superior court, in proceedings under section 1012, is better equipped than this court.

was a mere "technical impairment," not sufficient ground for a seizure (an argument made in this case by petitioner): "This language is so plain and clear that any attempt to interpret it would be almost an absurdity. It is apparent that the legislature intended by this provision that if any impairment whatever existed, the commissioner might in his discretion take over the business, property and assets of the association showing such impairment." (P. 98.)

### Statute Applies to Foreign Corporations

▇ Petitioner argues that section 1011 of the Insurance Code should be construed as not applying to foreign corporations. This argument is untenable. Article 14 of the Insurance Code, dealing with proceedings in cases of insolvency and delinquency, contains sections 1010 to 1062 inclusive. Article 14 begins with section 1010 which provides as follows: "The provisions of this article shall apply to all persons subject to examination by the commissioner, or purporting to do insurance business in this State, or in the process of organization with intent to do such business therein, or from whom the commissioner's certificate of authority is required for the transaction of business, or whose certificate of authority is revoked or suspended." Petitioner admittedly is doing business in this state and subject to examination by the commissioner and required to obtain a certificate. The entire article, including section 1011, is applicable to persons in the enumerated, independent categories. There is no requirement that corporations be domiciled in California. Moreover, prior to 1931, proceedings against foreign insurance corporations were provided for in sections 5, 6, Statutes 1919, chapter 178, page 265, while those against California corporations were provided for in section 2. In that year the provisions were combined by amendment of section 2 and repeal of section 5. (See Stats. 1931, ch. 1123, p. 2375.) These provisions in 1935 were codified in the Insurance Code in sections 1018 to 1022 (Stats. 1935, ch. 145, p. 553). Thus, petitioner is within the intended scope of the statute. The original sections required a proceeding under order to show cause, but in the codification in 1935, this requirement was eliminated.

### Due Process

▇ Section 1012 provides for a hearing, after seizure by the commissioner, either under section 1011 or 1013. Although the requirements of due process often involve a prior full hearing, it has long been recognized that where public neces-

sity requires, there can be action *followed* by a hearing. Familiar examples include the right to examine cattle for tuberculosis, slaughtering those found diseased (*Affonso Bros.* v. *Brock,* 29 Cal.App.2d 26 [84 P.2d 515]), the power to seize vehicles carrying narcotics (Health & Saf. Code, § 11611), and other situations where the public welfare requires prompt action.

The same principles have consistently been applied to institutions dealing with the financial affairs of the public. In the early case of *State Savings etc. Bank* v. *Anderson,* 165 Cal. 437 [132 P. 755, L.R.A. 1915E 675], the state superintendent of banks had seized a bank under a statute providing as follows: ''Whenever the superintendent of banks shall have reason to conclude that any bank is in an unsound or unsafe condition to transact the business for which it is organized, or that it is unsafe or inexpedient for it to continue business, the superintendent of banks may forthwith take possession of the property and business of such bank, and retain such possession until such bank shall resume business, or its affairs be finally liquidated, as herein provided.'' (The act also provided for an injunction proceeding to determine the merits, *after* seizure. Application for such an injunction had to be made within 10 days.) It will be noted that a really ''summary'' procedure was involved, since there was not even an application for a court order.

The California Supreme Court considered all possible constitutional arguments and held the legislation, and action thereunder, not violative of any constitutional right: ''The state owes to the public the duty not only of providing for supervision and examination of banks but the added duty as a matter of public policy, if the conditions warrant, of summarily closing them up and terminating their existence. When the management thereof has brought them into a condition of unsafety or insolvency the public interest demands that on this condition being ascertained they should not be permitted to further hold themselves out as responsible institutions or be permitted to remain in a position to do so. . . .

''In this view it cannot be said that initial seizure is not a fair and reasonable measure to be adopted to effect the protection of the public welfare which is designed by it, and as the only limitation on the power of the state imposed under the constitutional amendment is that the regulations it makes shall be of that character no constitutional right of the appellant has been impaired by such legislation.

"Nor is the due process of law clause violated because such summary seizure is authorized to be made without action brought and judicial warrant for the taking. Due process of law does not necessarily imply a regular proceeding in a court of justice or after the manner of such courts. . . .

". . . While the initial seizure is authorized under the act without suit brought and is justified as a matter of public policy for the reasons here given, it cannot be said that the bank is thereby deprived of its property without due process of law as heretofore defined. An opportunity is given the alleged delinquent bank to invoke the aid of a court of competent jurisdiction as to the validity of the seizure and right of the superintendent to hold the property, and if that opportunity is a reasonable one, then the right which the Constitution guarantees has been in substance preserved to it." (Pp. 446, 448.)

The United States Supreme Court affirmed the holding by a *per curiam* decision (238 U.S. 611 [35 S.Ct. 792, 59 L.Ed. 1488].)

In *North American Building & Loan Assn.* v. *Richardson, supra* (6 Cal.2d 90), the court held constitutional similar action, under a similar statute dealing with building and loan associations.

The legality of the Insurance Code was considered in a number of cases involving the Pacific Mutual Life Insurance Company. The California Supreme Court held that even though a court order might have been void, through disqualification of the judge, the action of the commissioner could be upheld under the summary seizure provisions (§ 1013) of the code, and that such provisions were legal: "Section 1013 of that code confers on the commissioner, whenever it shall appear to him that any insurance company is in such condition that its further transaction of business will be hazardous to its policyholders or creditors, the power to take summary possession 'without notice, and before applying to the court for any order.' Similar provisions for summary seizure exist in the Bank Act and Building and Loan Act. These sections have uniformly been sustained against the claim of illegal seizure. (*State Savings etc. Bank* v. *Anderson*, 165 Cal. 437 [132 P. 755, L.R.A. 1915E 675]; *North American Building etc. Assn.* v. *Richardson*, 6 Cal.2d 90 [56 P.2d 1221].)" (*Carpenter* v. *Pacific Mutual Life Ins. Co., supra*, 10 Cal.2d 307, 324.) See, also, *Holabird* v. *Richardson*, 3 Cal.2d 299

[44 P.2d 530], sustaining a summary seizure under the building and loan statute.

On appeal to the United States Supreme Court, it was held that questions concerning the validity of the seizure and whether it was valid by ratification or by the summary seizure provisions "concern matters of state law and amount at most to alleged erroneous constructions of the State's statutes by its own court of last resort. Such decisions would not be a denial of the due process guaranteed by the Fourteenth Amendment." (*Neblett* v. *Carpenter,* 305 U.S. 297, 302 [59 S.Ct. 170, 83 L.Ed. 182].)

It is not surprising that the Supreme Court found no due process issue, since it had approved a similar procedure, by *per curiam* opinion, 25 years earlier (*State Savings etc. Bank* v. *Anderson, supra* [238 U.S. 611]). Following the Neblett case it has been assumed that the validity of the Insurance Code was beyond doubt, with respect to the provisions for summary seizure, and, *a fortiori,* seizure *with* court order. Thus in *Caminetti* v. *State Mutual Life Ins. Co., supra* (52 Cal.App.2d 321), the court said: "There is no merit in the further contentions presented on this appeal: that the application of the commissioner for the ex parte order is deficient; that the court was without jurisdiction to make the order; and that the proceeding as a whole is based upon an unconstitutional statute. They are all covered by and disposed of, either directly or by analogy, in the Pacific Mutual cases." (P. 325.)

In *Title Guaranty & S. Co.* v. *Allen,* 240 U.S. 136 [36 S.Ct. 345, 60 L.Ed. 566], contentions similar to those made in this case were made concerning the seizure by the superintendent of banks of an Idaho bank. The banking act was challenged as unconstitutional. The court held (p. 141): "But assuming, as it is now insisted in argument was the case, that the question relied upon was the repugnancy of the state statute to the due process clause of the Fourteenth Amendment because power was conferred upon an administrative officer in the event of insolvency to close the doors of a bank without awaiting judicial proceedings, and that the observation on that subject by the court below was an adverse decision of such question, we think it suffices to state the proposition to demonstrate its want of merit. [Citing cases.]"

Petitioner contends that to make the application of statutes providing for summary seizure constitutional there must be a reasonable necessity for taking, coupled with an adequate

remedy giving the company whose assets are seized the right to show that the seizure was unnecessary and unjustified. There was such a situation here. In spite of the vehement assertions of petitioner that section 1012 does not provide an adequate remedy, such remedy is similar (except that there the company is required to take advantage of the remedy within 30 days of the seizure) to that provided in section 13.12 of the Building and Loan Act [1 Deering's Gen. Laws, Act 986] for seizures by the building and loan commissioner, which the court in *North American Building & Loan Assn.* v. *Richardson, supra* (6 Cal.2d 90), held constituted full protection from "any arbitrary and unjust seizure." (P. 102.) The only difference between the court proceeding established by section 13.12 of the Building and Loan Act and that established by section 1012 of the Insurance Code is that in the former the building and loan commissioner may be required to show cause why further proceedings should not be enjoined, while in the latter there is a hearing without such order. In either event, the seizure by the particular commissioner continues until after a complete hearing of the matter. Section 13.12 says that after "hearing the allegations and proofs of the parties and determining the facts, [the court] may upon the merits . . . enjoin the commissioner from further proceedings and direct him to surrender" etc. Section 1012 says that the order of seizure continues until upon the application of either party "it shall, after a full hearing, appear to said court that the ground" for the seizure does not exist.

### APPLICATION OF THE STATUTE TO A FOREIGN CORPORATION DOES NOT RENDER IT UNCONSTITUTIONAL

#### ▉ (a) *Extraterritoriality:*

Petitioner argues that if the statute applies to foreign corporations it attempts to exercise power over assets not in the state, and calls attention to the broad language in the order concerning vesting title to all of the assets of petitioner, "wheresoever situated." It argues that this must refer to assets outside of the state and that the court lacks power to change title to such property. Admitting the lack of power in California courts to transfer title to assets outside of the state, there are two answers to the contention: (1) Petitioner has not alleged that the state is attempting to transfer title to out of state assets, and therefore has no standing to complain. (2) The statute can reasonably be construed as valid,

the phrase "wheresoever situated" meaning within the state where the court has power to act.

A similar point was involved in *Franklin* v. *Peterson*, 87 Cal.App.2d 727 [197 P.2d 788], involving the validity of a municipal ordinance imposing a license for revenue purposes upon an attorney at law. There the appellant contended that the terms of the ordinance were broad enough to include persons outside the municipality. The court said: "It is the rule that where a statute or ordinance is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional, in whole or in part, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. The rule is based on the presumption that the legislative body intended not to violate the Constitution, but to make a valid statute or ordinance within the scope of its constitutional powers. Read in the light of this rule, the ordinance here in question must be held as intended to operate only upon those subject to the jurisdiction of the city of Los Angeles.

"Furthermore, a court will ordinarily inquire into the constitutionality of a statute or ordinance only to the extent required by the case under consideration. In the case at bar the stipulated facts show that appellant maintains a law office within the city of Los Angeles and carries on his law practice there. The construction given the ordinance by appellant would not, therefore, work any injustice upon him or violate his rights. He is therefore confronted with the general rule that one cannot complain of a possible illegal application of an ordinance if he himself is not a party thereby aggrieved." (P. 730.)

There are cases from other states in which the taking over by a state official of the assets of a foreign insurance company has been upheld. (See *People ex rel. Potts* v. *Continental Beneficial Assn.*, 289 Ill. 40 [124 N.E. 352] and cases cited therein.)

■ (b) *Unreasonable burden on interstate commerce:*

Petitioner argues that insurance has been held to be interstate commerce, and that the regulations in the Insurance Code, particularly, that allowing seizure if a foreign corporation enters into a merger, etc., without consent of the California commissioner, constitute an unreasonable burden on interstate commerce. In the case of *United States* v. *South-*

*eastern Underwriters Assn.*, 322 U.S. 533 [64 S.Ct. 1162, 88 L.Ed. 1440], it was held that for the purposes of the Sherman antitrust laws insurance was "commerce" and, in that case, interstate commerce. In making this holding, however, the court specifically denied that all state regulation of insurance must be found invalid. "Another reason advanced to support the result of the cases which follow *Paul* v. *Virginia* [8 Wall. U.S. 168 (19 L.Ed. 357)] has been that, if any aspects of the business of insurance be treated as interstate commerce, 'then all control over it is taken from the states and the legislative regulations which this court has heretofore sustained must be declared invalid.' Accepted without qualification, that broad statement is inconsistent with many decisions of this Court. It is settled that, for Constitutional purposes, certain activities of a business may be ,intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states. . . . And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid." (P. 547.)

To avoid any ambiguity which might still exist, the "McCarran Act" was passed shortly thereafter by Congress, declaring that "the continued regulation and taxation by the several states of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." (59 Stats. pp. 33, 34, 15 U.S.C.A. §§ 1011, 1012.)

Following the Southeastern case, there were a number of cases (in some of which the acts occurred prior to passage of the McCarran Act) in which insurance companies argued that state regulatory provisions previously valid had become invalid as unreasonable burdens on interstate commerce, when applied to foreign corporations. The cases are annotated at 164

American Law Reports, page 500. In all the cases there discussed, including two Supreme Court decisions, the state taxes and regulations were upheld.

In *Robertson* v. *California*, 328 U.S. 440 [66 S.Ct. 1160, 90 L.Ed. 1366], the court held valid sections of the Insurance Code which in effect allowed the state to exclude a foreign insurance company or its agents from doing business within California if the company failed to meet California's reserve requirements. Without relying on the McCarran Act, the court answered the argument about interstate commerce as follows: "It is quite obvious, to repeat only one of those considerations, that if appellant's contentions were accepted and foreign insurers were to be held free to disregard California's reserve requirements and then to clothe their agents or others acting for them with their immunity, not only would the state be made helpless to protect her people against the grossest forms of unregulated or loosely regulated foreign insurance, but the result would be inevitably to break down also the system for control of purely local insurance business. In short, the result would be ultimately to force all of the states to accept the lowest standard for conducting the business permitted by one of them or, perhaps, by foreign countries. Inevitably this would mean that Congress would be forced to intervene and displace the states in regulating the business of insurance. Neither the commerce clause nor the Southeastern decision dictates such a result." (P. 459.)

The court also stressed the fact that the statute did not *discriminate* against interstate commerce, but required only that foreign corporations meet the same requirements as domestic insurers. (P. 461.) The above reasoning is applicable to the present case. The provision allowing seizure by the commissioner applies equally to domestic or foreign corporations and is not discriminatory. Furthermore, it affects the sound financial condition of the company, and is therefore related to doing business in California.

Petitioner argues with reference to subdivision (c) of section 1011, that it would be burdensome, practically, to get the permission of all 48 commissioners to such a transfer of assets, if the company were doing business in all states. It is difficult to see why that would be more burdensome than submitting to examination in every state where the company does business, as the price of doing business in such state. Petitioner has cited no case in which state regulation of insurance,

as applied to foreign corporations, has been held an unreasonable burden on interstate commerce, and as shown, there are numerous cases to the contrary.

## WAS THE COMMISSIONER ARBITRARY IN THE SELECTION OF THE REMEDY?

Petitioner contends that the commissioner was arbitrary in his selection of the remedy for the conditions shown in the audit. The audit shows the capital to be reduced approximately 73 per cent of the aggregate par value of its issued capital stock. The result of the seizure, it is argued, is that the commissioner cannot rehabilitate or reorganize a foreign corporation whose main assets are outside this state, but only liquidate the company, and therefore such a seizure is too heroic for a condition which it describes as "technical insolvency." The application and its exhibit show that there were, among others, three conditions upon which the application was made: (1) a "merger" of petitioner and the Pioneer Equitable Insurance Company without the commissioner's consent; (2) conditions hazardous to the policyholders and the public; (3) insolvency.

Petitioner contends that the commissioner had other powers and remedies which were equally effective and less drastic than the remedy provided by section 1011, and hence it was arbitrary of him to select the latter method.

*People* v. *One 1941 Chrysler Sedan*, 81 Cal.App.2d 18 [183 P.2d 368], cited by petitioner, dealt with an entirely different set of facts. There, this court held that where there are alternative methods of giving notice under constructive service, a complainant may not select one which he knows will not notify the other party when he also knows that one of the alternatives, if selected, would notify him. Here, even though we might find that other remedies were open to the commissioner, we are required to go one step further and find that *as matter of law* the commissioner was arbitrary in proceeding as he did, instead of using another method. Under the circumstances of this case, we do not feel we can do so.

The other remedies suggested will be taken up seriatim. (1) Section 12928.6 of the Insurance Code provides that "Whenever the commissioner believes, from evidence satisfactory to him, that any person is violating or about to violate any provisions of this code or any order or requirement of the commissioner issued or promulgated pursuant to authority expressly granted the commissioner by any provision of this

code or by law, the commissioner may bring an action'' in the superior court for an injunction enjoining the continuance of such violation, etc. To hold that he should have used this remedy, or any of the others suggested and hereafter set forth, instead of the one he did use, means that we must hold, as matter of law, that during the long delay in which all the complicated matters would have to be heard or litigated in order to determine the correctness of the matters stated in the audit, the operation and affairs of the company should be in its hands instead of those of the commissioner. However, it appears from the decision in *Caminetti* v. *Imperial Mut. L. Ins. Co., supra* (59 Cal.App.2d 476), and from an examination of the Insurance Code, that it is the policy of the law in this state that whenever the commissioner deems the condition of a company hazardous, he should take over the company while these matters are being threshed out, rather than take the chance that, should the statements in the audit prove to be true, and the company in the meantime continue to take on new policyholders, great loss would result to them, as well as to the original policyholders. An examination of section 12928.6 shows that it is not broad enough to cover the situation disclosed in the audit. It is directed primarily to the stopping of certain acts occurring in this state, rather that to a situation which requires restoration of capital, or to acts occurring outside the state, where a California injunction could not apply. Moreover, an injunction complaint alleging the matters charged in the commissioner's application in this case, would have most of the serious effects on petitioner's business which it charges occurred as a result of the seizure here. (2) Section 700 of the Insurance Code provides for an administrative hearing under the provisions of the State Administrative Procedure Act. (3) General less drastic steps. This is rather an indefinite suggestion. (4) The commissioner's Bulletin 50 sets up a procedure by which the report of the examination staff is to be sent to the company involved, giving it 10 days to file objections thereto. These rules primarily are for intradepartmental regulation and do not necessarily require that this proceeding be taken before court proceedings are started. (5) Section 706.5 of the Insurance Code provides that the commissioner, whenever ''in his judgment, the investments of such insurer are not so made as to make available within a reasonable time sufficient moneys to meet promptly any demand which might in the ordinary course of events be properly made against the

insurer'' may ''order such insurer to cease to effect new contracts of insurance until its financial circumstances are changed sufficiently to remove such condition'' and may suspend or revoke the certificate of authority of the insurer if he fails to comply with such order. This remedy would probably result in most of the evils which petitioner complains of here, injury to the company's reputation, surrender of policies, and loss of its agents, brokers, etc. (6) A notice to petitioner to make good within a limited time the deficiency in its capital followed by a proceeding under section 12928.6, (1) above. (7) Section 704 of the Insurance Code provides a method for the suspension of the certificate of authority of the company. (8) The general power appearing throughout the Insurance Code to revoke, cancel or suspend certificates of authority. Just how the effects of proceeding under either (7) or (8) would be less drastic from the company's standpoint than the procedure taken does not appear. Any suspension of the right to do business in California would bring about the same injury to the company as occurred here, without a corresponding protection to the policyholders in the safeguarding of its assets, small as those assets are.

Taking all the alternative methods suggested by petitioner, they either are practically as drastic as the one used, and therefore would be as injurious to petitioner, or they do not provide the protection to the policyholders and the public which the situation disclosed by the audit could have required.

Petitioner contends that the controversy should have been determined in the declaratory relief action instead of under section 1011. That action was started by petitioner. The commissioner's failure to join issue in it has been acquiesced in by petitioner. While the condition of the company could have been ascertained by hearings in that case, the fact that it existed did not bar the commissioner from proceeding as he did. It, also, was subject to the objection that the interests of the public could not be fully protected by a proceeding which did not give the commissioner the control of the company's assets.

The test to be applied to the action of the commissioner is, was the selection arbitrary as matter of law? Many of the proposed remedies would have been as disastrous to the petitioner as it claims is the one chosen. But the prime consideration is the protection of not only the policyholders of the company but also the public. The matters set forth in the audit are serious. They show that the company has

been losing over a million dollars a year for the last three years. The time required to have a complete hearing of the truth of these charges (which petitioner says is debatable) would be very great. If they are true, it is probable that long before a hearing could be concluded, unless petitioner repaired its capital and changed its practice in the meantime, the company would be in such a condition as to place its new, as well as old, policyholders in a precarious situation. The refusal of the insurance commissioners of 33 states to join with the commissioner in action against petitioner; the commissioner's refusal to join in the convention audit, or to await its outcome; the fact that the commissioner had known of much of petitioner's situation for the past year; and the other matters stressed by petitioner, do not overcome the fact that when he received the audit and saw the actual hazardous situation of the company as of December 31, he was justified in taking immediate action. The law contemplates that when that danger exists (even though it may not be immediate) the commissioner may use his judgment as to which remedy to select. If we assume, as we must from the face of the audit, that the condition of the company was hazardous and insolvent (even though the results of that condition would not be felt immediately), the commissioner selected the best remedy. It would be a breach of his duty to the public to permit the company to go on writing business.

### MERGER

Section 1011 of the Insurance Code permits seizure where the insurance company has "entered into any transaction the effect of which is to merge, consolidate, or reinsure" etc., without first obtaining the commissioner's consent. It is unnecessary for us to determine whether the transaction with Pioneer was a merger under this section, or, if so, whether the law can constitutionally require a foreign corporation to obtain consent of the California commissioner. The commissioner is making no claim of the illegality of that transaction. While he refers to it as a 'merger" and we have used the word herein, it is without any legal signification. We are concerned with the effect on the finances of the company of the commitments made in the agreement.

### ADMITTED FACTS DO NOT ESTABLISH ABUSE OF DISCRETION

To entitle petitioner to the relief sought here, we must find from the admitted facts that the commissioner, as

a matter of law, abused his discretion and that the taking was arbitrary. This court is not equipped to pass upon the truth of the matters set forth in the report or the charges made by petitioner where a conflict as to those matters exists. To determine such matters would require a hearing as long and as involved as one under section 1012. ■ Mandamus is to be resorted to only when the usual and ordinary forms of remedy are insufficient to afford redress. The code itself provides that the writ shall be issued ''in all cases where there is *not* a plain, speedy and adequate remedy, in the ordinary course of law.'' (Code Civ. Proc., § 1086; emphasis added.) The writ may issue only when it is evident that the law has provided no other sufficient remedy. Here the remedy granted by the statute is not only equally as convenient, beneficial and effective as mandamus, but is far more convenient and effective. The trial court is far better equipped to pass on the controverted fact questions than this court. (16 Cal.Jur., §§ 17, 18, pp. 784 et seq.) A mandamus proceeding should not be used as a substitute for the hearing before the trial court provided by that section.

■ The facts upon which plaintiff bases its charge of arbitrary action either do not support such charge or are denied by the commissioner and would require a hearing to determine their truth. The facts mainly relied upon follow:

1. It is contended that all of the criticisms and complaints made of petitioner by the commissioner were corrected and his requirements complied with excepting only petitioner's refusal to eliminate completely Mr. Hopps. The record does not support this claim. The petitioner had not agreed to stop the practices which were criticized by the commissioner and in the report. Moreover the commissioner contended that the company was insolvent. The commissioner requested the company to stop writing policies in California until these matters could be straightened out. This the company refused to do.

2. Petitioner sets forth a number of acts of the commissioner, such as his failure to disclose his adjustments to the company's balance sheets, which it contends show as matter of law that he was arbitrary in his actions and was acting for the sole purpose of eliminating Mr. Hopps. Logical reasons for these acts have been given by the commissioner or his attorneys. Whether these reasons are well founded would require the taking of testimony.

3. Petitioner contends the information in the commissioner's possession did not show a hazardous condition of the company's affairs because it claims that:

(a) The brokerage contracts referred to in the report were cancelled. The reports show that some of these were replaced with what it is contended were "worse" contracts. Testimony would be required to determine this question.

(b) The alleged excessive underwriting was substantially reduced. Reference is made to a transcript which is not before us.

(c) The objections in the report to the "alien reinsurance" situation is matter of "pure conjecture." The report shows that this kind of reinsurance was doubled in 1948. Under California law these alien companies do not meet the standards required for reinsurance. (See Ins. Code, § 989.) That fact alone makes the doubtfulness of their value more than "pure conjecture."

(d) The right of Lloyds to cancel their reinsurance is relatively of no importance, as it probably never would occur. Whether the matters set forth in the report which the auditor considered a change in underwriting giving Lloyds the right to cancel, is such change or not, the report shows that the very existence of the company depends upon the continuance of the Lloyds contract. Perhaps, upon a hearing of all the facts in this case, it might be determined that it is not hazardous, but we cannot say as matter of law that placing so many eggs in one basket is not a hazardous thing for a company to do.

(e) The loss of $1,000,000 on the Pioneer transaction adds nothing to hazardous condition as a separate ground. However, this is an erroneous statement. The entry by an insurance company into a contract which caused it to lose that much money (if it did) might be placing the company in a hazardous condition, whether it did or did not make the company insolvent.

(f) The derivative stockholders' suits should not be considered. These suits are an incident of the commissioner's claims that company funds are being used for the private gains of company officers.

(g) Questionable investments were cured. We are unable to determine that this is so from the record before us. It will require evidence to determine this.

(h) The fact that records of the company do not support certain payments does not show that the payments were im-

proper. The failure to keep proper records is a circumstance to be taken into consideration by the commissioner when considering whether or not the company is in a hazardous condition.

4. Petitioner contends that the commissioner was not justified in considering the company insolvent, because (a) the commissioner admitted that his justification for the claim of insolvency stands or falls on the effect of the Pioneer agreement. We have no such admission before us. The statement of the commissioner quoted in respondents' supplemental memorandum (p. 49) does not justify this conclusion. The statement merely shows that the making of this agreement, when considered with all the other matters, caused the commissioner to feel that immediate action should be taken, not that it was the only fact upon which he based his determination of insolvency.

Petitioner contends that the commissioner's determination of insolvency is open to grave doubt because certain other state commissioners disagree with his conclusion and no state commissioner has taken action similar to this. If the record supports the commissioner in reasonably believing the company to be insolvent under the laws of California, it is immaterial what the commissioners of other states do.

In arriving at the conclusion of insolvency the report takes certain matters into consideration, which petitioner claims were erroneously considered. They are: (1) The Lloyds commission. The commissioner allowed a return to the company of only 25 per cent of Lloyds' commission, when petitioner's 1948 statement assumed 46 per cent. Settlement will not be made until March, 1950, so it is necessary to estimate the amount of the commission based upon an assumed loss ratio. The company assumed a loss ratio of 50 per cent based upon its loss experience of three months under the contract and the company's previous average experience over a 10-year period. The commissioner's auditor took the position that as there had been no real experience under the contract the company should take credit only as of December, 1948, for the commission which the contract guaranteed, namely, 25 per cent. Petitioner's brief states that the company carried $1,300,000 unearned premium reserve on California business when in normal course they expected to pay out in losses only $450,000. This would indicate that the commissioner was not far wrong in anticipating a greater loss in the Lloyds situation than that estimated by the company. We cannot

say as matter of law that in the interests of safe practice and protection to present and prospective California policyholders, the commissioner was wrong in crediting the company only with commissions it was guaranteed, rather than a sum which was highly speculative. (2) The report disallows as assets $379,500 face value notes of Pioneer. These notes are not referred to in any of petitioner's pleadings, but are referred to in its briefs. These notes were unsecured. Petitioner contends that the report shows that Pioneer retained assets more than sufficient to take care of these notes. Assuming these assets to be of the value claimed, we cannot say that as matter of law the auditor was wrong in not considering a sound investment these unsecured notes of a company that was preparing to go out of business.

Petitioner contends that by admissions in the commissioner's reply to the amicus curiae brief, the commissioner has admitted that $414,808 should be added to the company's assets. This is a wrong construction of the position taken by the commissioner. There is no evidence before us that these alleged assets existed at the time of the seizure nor that the commissioner had knowledge of them.

Petitioner lays emphasis upon the situation as to the receivable shown in the company's statement due from the U. S. Interstate Brokerage Corporation in the sum of $923,761.45, which the auditor questions. (It was not deducted by him in arriving at the figure which shows the company to be insolvent.) Petitioner alleged in its amendment to the petition that as of December 31, 1948, the date to which the audit relates, that sum had actually been reduced to $139,873.89, and that on the date of seizure, it had been reduced to $24,039.19 and that the commissioner knew or should have known on each of these dates the exact situation of that account. In his return to this amendment, the commissioner alleged that he had no notice of the true condition of this account for the reason that petitioner denied the commissioner's examiners full access to the books which would have revealed the true status of this account. The report sets forth at some length the inability of the examiner to get the details of this account due to the action of petitioner's officers and employees. If the facts set forth in the report and as alleged by the commissioner are true, it is obvious that the commissioner did not know the true situation of this account and could not have known it. This issue is one which would require evidence.

In *North American Building & Loan Assn.* v. *Richardson, supra* (6 Cal.2d 90), the building and loan commissioner seized the assets of the company based upon a report made him by a firm of certified public accountants. An attack, somewhat similar to the one in the case at bar, was made upon this report. The appellant endeavored "to destroy the effect of this report by an analysis of the various items of the report in an attempt to prove that if certain items had been considered as assets and certain other items had not been classed as liabilities, the capital impairment would not have been so large." (P. 96.) While the impairment there was much greater than in our case, the court held that the audit followed good accounting practice. It found that the report of impairment of assets was a fair one. Here, in spite of petitioner's attack on the report, it appears on its face to be fair and well founded. To prove it otherwise requires a trial. Moreover, the basis for the commissioner's claim of insolvency is not only the report but also the company's own statement of December 31, 1948, and the commitments in the Pioneer agreement.

There are certain allegations in the commissioner's return which support his contention that he was justified in the seizure. Some of these merely demonstrate the background, which it is alleged caused the commissioner to consider petitioner's management subject to question. Thus it is alleged that since 1945 studies have been made of petitioner's financial statements and of examination made by departments of other states, all of which indicated reinsurance dealings by the petitioner, which resulted in great loss to it; that the admission to California of a sister company under common management with petitioner was conditioned on certain agreements to refrain from certain dealings; that this agreement was violated and then in 1948, following certain disclosures by quarterly statements of the petitioner and the other company, the latter agreed to, and did, cease writing insurance in California until its finances were repaired. Then there are allegations which, if true, are quite serious. Thus it is alleged that in 1948, petitioner filed certain quarterly statements with the commissioner, which statements were false; that the examinations of petitioner by Pennsylvania and Indiana examiners as of September 30, 1948, stated that it was not possible to present an accurate statement of the financial condition of petitioner; that petitioner withdrew under compulsion from Minnesota, Connecticut and New York

during the years 1947-48; that in two of these states the withdrawal followed complaint from the commissioners of those states of speculative investments by petitioner, of filing unreliable financial statements, of investments by petitioner in companies in which its officers had financial interests. All of these allegations will require evidence to determine their truth or falsity.

## LIQUIDATION

Petitioner has contended throughout that the effect of the seizure of a foreign corporation means almost automatic liquidation and no possibility of rehabilitation. This is not necessarily so. Whether there is conservation and rehabilitation or liquidation depends upon the attitude of petitioner. If it refuses to send into California sufficient moneys to meet claims for losses and returned premiums on cancellation of policies (even under company management there is not kept in this state sufficient funds for these purposes), if it refuses to cooperate with the commissioner in his endeavors to rehabilitate the company, then the commissioner will have to apply to the court for a liquidation order under section 1016. It is the conservator's duty to try to remove the causes leading to the company's difficulties. If this cannot be done, he must attempt to rehabilitate its business, and if this cannot be done, liquidation will have to follow. (*Carpenter* v. *Pacific Mutual Life Ins. Co., supra* [10 Cal.2d 307].)

So far as the effects of seizure are concerned, there is not so much difference between a foreign and a California corporation. The effect of the seizure is practically the same, a bad reputation for the company, cancellation of policies, the loss of its brokers and agents. But the Legislature must have had those results in mind when adopting sections 1011 and 1013. So far as rehabilitation of the company is concerned, it is easier, of course, to rehabilitate a local company because the entire assets are within the state and in the hands of the conservator. However, rehabilitation requires the consent and cooperation of even the local company's stockholders. If they are not forthcoming, the commissioner cannot rehabilitate the company. Perhaps not to the same degree, but to a large extent, the foreign company can be rehabilitated if its stockholders cooperate. This difference in degree is one of the conditions which a foreign corporation must necessarily face as the price of doing business in a state other than its home state.

Assuming, as claimed, that the commissioner will not come into possession of over $145,000 and the normal loss on policies in force is at least $450,000, that there will be a large number of policies cancelled because of the seizure and the unearned premiums will have to be refunded, the commissioner was entitled to feel from the conditions disclosed in the audit that, in spite of such results, the protection of the public as well as of the then policyholders required such action. While this court might have concluded otherwise, were the decision, in the first instance, up to us, still we cannot find, as matter of law, that his action was an abuse of discretion.

Petitioner alleges that the commissioner, although conceding that he has no power to cause the removal of Hopps, the chairman of the board of directors of the company, was actuated in bringing this proceeding because of the failure of petitioner to remove Hopps entirely. Were the financial condition of the company beyond question, and did it not appear that Hopps was, at least, partially responsible for the impairment of the company's assets, this might be important. The commissioner has no power, for personal reasons, to cause the elimination of any individual connected with an insurance company. But, where a course of conduct by that individual has caused serious loss to the company, the commissioner has the right to require that those practices be abandoned. (See *Caminetti* v. *Guaranty Union Life Ins. Co., supra* [52 Cal.App.2d 330].) A reasonable conclusion can be drawn from the facts stated in the audit, that petitioner has been dominated by Hopps, and, to some extent, run, for the benefit of himself and other companies in which he was interested, to the detriment of petitioner. Such a fact, if it is a fact, coupled with the other circumstances of the case, would make the commissioner's objection to the practices of Hopps justifiable.

The alternative writ is discharged, and the petition for a peremptory writ is denied.

Peters, P. J., concurred.

WARD, J.—I dissent.

I believe that the admitted facts set forth in the record, as a matter of law, show that in seizing the California business and assets of the Rhode Island Insurance Company the commissioner abused his discretion and acted in an arbitrary

manner, resulting in practical destruction of the California company and great financial loss to the policyholders.

This petition for a writ of mandate was previously ruled upon by this court. (209 P.2d 72.) A rehearing was granted, the petition reargued, and after the filing of additional briefs the matter was resubmitted. On the prior hearing the demurrer was sustained, and based upon that order the alternative writ was discharged and the petition for a peremptory writ denied. On the present hearing all of the original pleadings and certain pleadings filed subsequent to the rehearing have been considered. Included therein is a document which has been referred to as an "audit." This document was prepared under the direction of the California commissioner and filed as an exhibit in the superior court on the application of the commissioner to "take possession" of the California business of the Rhode Island company. This exhibit, which contains the material forming the real basis of the commissioner's action, was considered on the prior and present hearing. However, in addition, the factual matters alleged in certain pleadings, the admissions of counsel and the record generally have been considered.

The real problem presented is whether the Insurance Commissioner made the application upon technical and trivial grounds to obtain an order as a conservator, which gave him the authority to "seize" the company and to displace the present management, office force and employees. In other words, the question presented is whether the commissioner arbitrarily abused the power of decision vested in him to act under statutory provisions. That the drastic and harsh action of the commissioner will result in the destruction of the California business of the company is admitted. To date the company has complied with every request of the commissioner, but not his demand to displace one of its officials. As I understand the commissioner's theory, it is that a summary seizure may be made though other remedies are available as preventives against any hazardous condition that *may* arise. In the meantime, the commissioner's action directly harms California policyholders of the company and, indirectly, its policyholders throughout the nation. The California policyholders whose policies were thus cancelled are forced to pay two premiums for the same insurance. The commissioner's action indicates a design on his part to avoid a hearing before the destruction of the company has been accomplished. The commissioner seeks to justify his action on

the ground that courts in other cases—upon different facts—have upheld seizure without a preliminary hearing.

The issuance of the order of seizure under Insurance Code, section 1011, the section under which the commissioner purports to act, is mandatory upon the court, provided certain conditions exist as must appear "upon the filing by the commissioner of a *verified* application." (Italics added.) The "final return" of the commissioner filed in this proceeding on June 8, 1949, alleges that the order of seizure made in the superior court was secured pursuant to the provisions of Insurance Code, section 1011, and that it "was based upon the insolvency of said petitioner, upon its hazardous condition, and upon the merger of its business and that of Pioneer Equitable Insurance Company, of Indiana." It is then stated that the alleged insolvency and hazardous condition are based upon a "report" of examination which is set forth as "Exhibit 'A' to said Exhibit 'A' to said petition." It must be admitted that the document is not an "audit" and does not purport to be an audit, but is a "report," and it will be so referred to in this dissent. The report relates certain facts, certain distorted facts, certain information obtained from "hearsay" sources, and the balance consists of statements on "hearsay," statements built upon "hearsay," or conclusions based on surmise.

If an emergency should appear to exist based upon the grounds as enumerated in section 1011 of the Insurance Code so as to require that the commissioner "act immediately," that is, in an emergency, the commissioner may "take possession" of the property of a company without notice and before securing an order of court. (§ 1013.) Without discussing the constitutionality of section 1013, it is apparent that it provides that the commissioner have power to act in an emergency "immediately," without filing a "verified" application setting forth the grounds of seizure. Section 1011 of the Insurance Code provides that upon the filing of a "verified" application showing the existence of certain enumerated conditions the superior court "shall" issue an order vesting title in the commissioner to all assets of the subject company "wheresoever situated." Some of the enumerated grounds for seizure are: (1) refusal to submit its books; (2) that the company *"is found, after an examination"* to be in a hazardous condition; (3) a merger with another company without the consent of the commissioner, and (4) insolvency. (Italics added.) No mention is made in section 1011 with

respect to immediate seizure. Section 1013 is an emergency measure; the other, 1011, provides an orderly legal procedure that should insure the protection of the company and the policyholders. Section 1011 is mandatory only after the alleged but verified reasons for seizure are apparent.

A "verified" application is one that is supported by a statement certifying under oath that the allegations in the application are true. (*People* v. *Thompson,* 5 Cal.App.2d 655 [43 P.2d 600]; *McCaffey C. Co., Inc.* v. *Bank of America,* 109 Cal.App. 415 [294 P. 45].) Ordinarily, a state officer in his official capacity is not required to verify the allegations set forth in an application presented to a court in behalf of the state unless verification *is demanded* by statute. Verification is demanded in section 1011. "A pleading may set forth an instrument or other exhibit *in haec verba,* i.e., verbatim, or attach a copy and incorporate the same by clear and distinct reference thereto in the pleading; it then becomes a part of the complaint. Where, however, the instrument is the foundation of the cause of action or defense, such incorporation does not eliminate the necessity of specific allegations of the material facts, nor do the *recitals* in the instrument take the place of such allegations. [Citing cases.]" (Summary of Cal. Law, Witkin, Code Proc., § VI B. 3, p. 902., Matters of substance must be set forth in direct terms, not in equivocal recitals. (*Silvers* v. *Grossman,* 183 Cal. 696 [192 P. 534].) Here, the attachment of the report as a base for the allegations is not a mere assertion of its existence but the allegations of the application are founded upon the statements set forth in the "report." (*Washer* v. *Bank of America,* 21 Cal.2d 822 [136 P.2d 297, 155 A.L.R. 1338].) Such a report must state the truth without equivocation. The only claim of verification which the commissioner could make would be with respect to the affidavit attached to the application, which is made in the usual form verifying as to actual knowledge except as to matters stated upon information and belief. No reference is made to the truth of the "report." It is sometimes permissible to state the existence of certain facts on hearsay evidence if the grounds of the hearsay evidence are given so that the truth of the statement may be determined. (Am.Jur. vol. 1, p. 951.) The attachment to a pleading in a court proceeding of a copy of a written document as an exhibit is a representation that the document is a genuine and correct copy of the original, but it does not necessarily purport to set forth a narration of the truth.

If the pleading is presented under oath an inference may be drawn that portions of the exhibit recite the truth except as to the matters stated therein on information and belief and that the party believes such matters to be true. However, if the document shows the falsity of its own recitals then the exhibit should not be used as the foundation for the issuance of an order of court to seize a business. The following appears in the report and is a sample of one of the methods used to obtain the order of seizure: ''Your examiner *questions the admissibility* of a balance in the amount of $923,761.45 due from U. S. Interstate Brokerage Corporation as of September 30, 1948 until the ownership and the location of this agency can be better established. . . . *We have been advised* that the Pioneer Equitable Insurance Company, under the same management contract as Rhode Island Insurance Company, that is, the International Management Corporation, until June 30, 1948, when the Pioneer severed its connection as a member of the Rhode Island Group, *intends* to make claim for the excessive commissions charged on brokerage inasmuch as this contract had never been submitted to its Board of Directors for approval.'' (Italics added.) Such statements are not made positively, nor is information given indicating a foundation of their truth. (See *California Trust Co.* v. *Gustason,* 15 Cal.2d 268 [101 P.2d 74].) The quoted item of $923,761.45 will be referred to later.

If it be assumed that in preparing the report official duty has been regularly performed (Code Civ. Proc., § 1963, subd. 15) such presumption is controverted by the presentation of this *unverified* report and *its contents.* An official written document should be authenticated by the certification of the legal keeper thereof. (Code Civ. Proc., § 1918.) The ''report'' in this case is not authenticated. It comprises 201 pages. Only 104 pages appear over the signature of an insurance examiner. The balance of the report contains exhibits and some further information in narrative form. Its contents demonstrate that as a matter of law it could not be used as the basis of a seizure even if it were verified. This conclusion appears certain when the grounds of the seizure are considered, as hereinafter set forth.

The commissioner justified his action of ''seizure'' upon three grounds: (1) ''insolvency''; (2) ''hazardous condition,'' and (3) ''merger'' with another insurance company. On the prior hearing before this court the commissioner stressed the

allegations with respect to a "merger." In the application filed in the superior court it is alleged that Rhode Island "without first obtaining the consent in writing of the said Commissioner, has entered into a transaction the effect of which *is to merge* and consolidate substantially its entire property and business in or with the property and business of another insurance company, to wit: Pioneer Equitable Insurance Company of Indiana." (Italics added.) It appeared that the alleged "insolvency" and "hazardous condition" primarily were based upon the alleged "merger." The report indicates that an agreement was executed to the effect that the petitioner herein, Rhode Island, "reinsures and takes over the entire insurance business of Pioneer Equitable" as shown by "Rhode Island's 1948 annual statement, showing its financial condition" and that the report "has been adjusted to reflect the effect of this reinsurance agreement." The "merger" is not a present consolidation of the two companies, but is merely a reinsurance contract, approved by the Insurance Commissioner of Indiana, upon the deposit of Rhode Island securities of an agreed valuation as a pledge of Rhode Island's faithful and prompt performance of the obligations of payment of possible liabilities. Pioneer Equitable in its independent and nowise consolidated aspect also agreed to make a deposit of certain securities with the Indiana commissioner. Under the terms of the reinsurance contract, not a present but a future discontinuance of business of Pioneer Equitable may occur. "In the event that such steps [the performance of the reinsurance contract] require the disssolution and/or liquidation of Pioneer, Pioneer agrees promptly to take steps to dissolve and/or liquidate." However, the majority opinion holds that "It is unnecessary for us to determine whether the transaction with Pioneer was a merger under this section, or, if so, whether the law can constitutionally require a foreign corporation to obtain consent of the California commissioner. The commissioner is making no claim of the illegality of that transaction. While he refers to it as a 'merger' and we have used the word herein, it is without any legal signification." Irrespective of the contentions of the commissioner, the ground for "seizure" based upon "merger" need not be given lengthy consideration though the financial transaction involved may be pertinent in discussing the questions of "insolvency" or "hazardous condition."

There are many judicial declarations from this and other jurisdictions, made no doubt to fit the facts of each particular

case, on the question of the power conferred by statute on public commissions and boards. Each case, however, must stand on the particular facts involved. The facts of the case at hand must be considered separately from the facts of all other cases. Because one seizure of the property and management of a company has been approved by an appellate court does not mean that the language used by the appellate tribunal in that instance is applicable to all similar subsequent "seizures." That the foregoing statement is founded on a reasonable and sound theory may be illustrated with respect to the subject of insolvency. If a bank, building and loan association or insurance company is found destitute of funds caused by the fraudulent methods of the management resulting in legal insolvency, harsh language and strict rules, based on statutory construction, often appear as the reaction to the offended sense of justice of the author of an opinion on the matter. Such language, however, should not be used as an influence or guide in determining problems based upon different facts. Such a practice would lead to a remedy not appropriate to the case. A judicial precedent based upon analogous facts may be an authoritative determination directing a logical conclusion, but when such precedent is applied to facts materially differing it may result in a decision that is not conformable to justice.

The constitutionality of the various sections of the Insurance Code here involved need not be determined. For the purpose of considering this proceeding it may be assumed that they are constitutional. The commissioner relies strongly on *North American Building & Loan Assn.* v. *Richardson,* 6 Cal.2d 90 [56 P.2d 1221]. In that case on an appeal taken by the building and loan association against the commissioner, the primary question to be determined was the sufficiency of the evidence to uphold the judgment of the trial court. There an audit prepared by a "firm of certified public accountants" was introduced to prove "a capital impairment" of the association assets. In the present proceeding the question presented is not the sufficiency of the evidence but the sufficiency of the pleadings and whether the unsigned and *unverified "report"* sets forth such inconsistent, contradictory, exaggerated and minimized statements that as a matter of law it should be declared insufficient to base an order of seizure. In this case the alleged "insolvency" and "hazardous condition" are grounded on the "report." The "report" contains alleged data which primarily brought

about the seizure. The application made to the superior court for the order of seizure does not purport to claim that the narrations or statistical matter recited in the "report" are in fact true. The "report" itself demonstrates that at least some of the items are untrue, and that others are exaggerated or minimized. In some instances the author of the report resorts to rumor instead of facts. The use of such terms as "We are informed" or "We have been advised," without stating the source of the information or advice, are typical examples of the uncertainty of the information contained in the report. The "report" admits the author's inability to understand certain statistical adjustments because, as the report states in substance, no effect was given in the adjusted financial statements due to legal aspects and insufficiency of data.

A suggestion is made that the commissioner was unable to obtain certain statistical data from the Rhode Island company. If that accusation were true, that is, in the sense that the company offered no excuse for refusing to give certain financial data to the commissioner, then all the commissioner needed to do in order to obtain full control of and title to the assets of the company was to file a "verified" application showing that the company had refused to submit its books "to the reasonable inspection of the commissioner. . . ." (Ins. Code, § 1011.) But no such application was made. During part of this period the books were under inspection by representatives of other states. There is no claim that any commissioner seized the property in any other state.

On the question of insolvency, the majority opinion states: "The commissioner concedes that there is an excess of assets over true liabilities, so that no actual insolvency exists." This statement appears to be correct. On the date of the seizure the commissioner obtained only $145,000 in assets. However, available assets might have reached the required amount the day before the seizure. There is no claim made that the home office, upon receipt of a request by wire, for instance, from its San Francisco office, could not have furnished the required amount immediately.

The commissioner contends that there is an overcredit of $616,589.79 on reinsurance commission payable to Rhode Island from "Lloyds." In the petition for rehearing the Rhode Island company states: "The Lloyd's contract provides for a decreasing scale of commissions, based upon Petitioner's loss ratio with a minimum of 25% as shown in the

audit. The Commissioner arbitrarily assumed that only the minimum commission, the 25%, will be earned. In order for Petitioner to receive no more than 25%, it would have to incur an unprecedented ratio of 65%. In the ten-year period from 1938 to 1947 the company's loss ratio has averaged 51.4%. The contract provides that if the loss ratio is 50% the commission is 46%. If the loss ratio is 51.4% the commission is 1.4% less, or 44.6%. It is obvious therefore that the write-off of $616,589.79 on the arbitrary assumption that only a 25% commission will be earned is capricious and arbitrary. On the basis of Petitioner's average loss ratio of 51.4% the Commissioner's figure is arbitrarily excessive by $563,238.79. Therefore over $563,238.79 of the $616,589.79 is on the face of the audit, an unjustified, arbitrary write-off." The majority opinion states: "The right of Lloyds to cancel their reinsurance is relatively of no importance, as it probably never would occur. Whether the matters set forth in the report which the auditor considered a change in underwriting giving Lloyds the right to cancel, is such change or not, the report shows that the very existence of the company depends upon the continuance of the Lloyds contract." The majority opinion then adds: "Perhaps, upon a hearing of all the facts in this case, it might be determined that it is not hazardous, but we cannot say as matter of law that placing so many eggs in one basket is not a hazardous thing for a company to do." It could just as well be said that since 1688, the year Lloyds was founded, the reputation of "Lloyds" for stability has not been questioned. In such a situation it is well that Rhode Island protects its stockholders and policyholders by hatching its eggs in a "Lloyd" basket.

Other reasons for the seizure are given, based upon minor matters, which will be referred to briefly. The "hazardous condition" problem will be referred to later. One of the minor reasons given for the seizure is that three other states—Minnesota, Connecticut and New York—have either directed or suggested that the Rhode Island Insurance Company should cease doing business in the named states. It appears that the commissioners of several other states were interested in auditing the company's books, but the record does not show that any action was taken against the Rhode Island company except in the three states mentioned. In the petition for writ of mandate a verified statement appears over the signature of an official national examiner, as follows: "For more than the

past two weeks I have been engaged, together with other examiners, in making a convention examination of the business and affairs of the Rhode Island Insurance Company and for that purpose I am at present in the City of Philadelphia, Pennsylvania, where the records of the company are located. . . . That on May 24, 1949, I sent a straight wire telegram to Honorable J. Edwin Larson, Insurance Commissioner of the State of Florida, Tallahassee, Florida, who is also President of the National Association of Insurance Commissioners of the United States, reading as follows: 'Retel concerning financial condition of Rhode Island Insurance Company. Examiners representing zones one, two, three, four and five are now conducting an examination of the subject company. Zone six had accepted assignment but to date not represented. No evidence of an insolvent condition apparent and current publicity and unrest resulting from California action appears to be unwarranted on the basis of information at hand. . . .' '' Another ''verified'' statement appears therein, as follows: ''I am an official examiner in the office of the Insurance Commissioner of the State of Rhode Island. . . . I am in the process of making an examination into the affairs and condition of the Rhode Island Insurance Company and we do not concur with the allegations of the California Insurance Department that the Company is on the verge of insolvency. All the facts set forth in this affidavit are true and correct.'' In view of the fact that the majority opinion sets forth, as one of the minor reasons for the seizure in California, the action taken in Minnesota, Connecticut and New York, it seems proper to call attention to the fact that the Rhode Island company was licensed in 30-odd states and that no other state has taken the action adopted in the three states mentioned, and that those three states only resorted to the giving of a notice to the company *to cease certain practices. No state except California had adopted the plan of destruction of the company* and consequent injury to its thousands of policyholders in this state. The action of Minnesota is proof in itself that the harsh action taken in California is not justified. In Minnesota the Rhode Island company was notified that the commissioner disagreed with certain practices then being followed and that Rhode Island should discontinue the practices or withdraw from business in that state. The company concluded it was justified in continuing its current policy and preferred to voluntarily withdraw. In California the

commissioner made a demand on the company to withdraw from business *and then withdrew the demand.*

The majority opinion fixes a legal rule or test to be applied by the trial court: "Under section 1011 [Ins. Code] nothing is required beyond the good faith determination by the commissioner of the existence of one of the conditions enumerated in the section." Section 1011 does not contain one word about "good faith." There is a decision which used language similar to that of the test set forth in the majority opinion. In *Caminetti* v. *Imperial Mutual Life Ins. Co.*, 59 Cal.App.2d 476, the court, at page 487 [139 P.2d 681], stated: "In obtaining his original ex parte order, the commissioner is not required to show to the court that the company was in fact in a hazardous condition, but only that he, as a state officer, invested by legislative authority with the power, has so 'determined' and 'found.'" In that case the court affirmed an order restoring the business to the insurance company.

The rule of "good faith" may be applied to the record and to admissions made by counsel. It is the desire of the commissioner from the commencement of this proceeding to have the company discharge a certain Mr. Hopps. That the commissioner's attitude toward Hopps has not changed is apparent from a remark of the attorney general representing the commissioner at the oral argument, referring to Hopps and his removal: "Well, I think the commissioner felt that that was the seat of the trouble." The following day the position of the commissioner was changed to the extent that a rehabilitation could occur if the company complied with all of the commissioner's directions. In the commissioner's supplemental memorandum of points and authorities, on page 41, the following appears: "He [the commissioner] further insists that any rehabilitation of the company must include riddance of Mr. Hopps." I do not purport to commend or to condemn the activities of Hopps. The point is that the commissioner may direct the change of policies and practices in the operation of an insurance company, so far as California has jurisdiction; but the commissioner may not direct the change of the officers of a company. If the commissioner has the authority to "fire" he likewise has the authority to "hire." This could lead to political dictatorship in insurance matters. The authorities on this subject, that is, where personnel is concerned, are directed to change of "practices" and not the removal of officers. The strange feature of this phase of the

case is that the commissioner knows that he does not possess the authority to demand the removal, but still persists in the "riddance" of Hopps. To my mind this shows lack of good faith as a matter of law, and the trial court is not called upon to pass upon the good faith issue as a matter of fact.

The majority opinion admits that the effect of seizure is "bad reputation for the company, cancellation of policies, the loss of its brokers and agents." This effect is destruction and, upon the record in this case, arbitrary action. It demonstrates the lack of good faith on the part of the commissioner.

The commissioner's lack of good faith also is patent from the record on the allegations in reference to an alleged receivable, heretofore referred to, which was due Rhode Island Insurance Company from the U. S. Interstate Brokerage Corporation in the sum of $923,761.45. In an amendment to the petition by the Rhode Island company to this court it is stated and *verified* that "the facts are that as of 12/31/48, said receivable of Petitioner had been reduced to $139,873.89 *and Commissioner knew or should have known this to be the fact*; . . . that on May 17, 1949, the date of seizure by the Commissioner, said receivable had been reduced to $24,039.19, *and Commissioner knew or should have known* as of the said date of said seizure that of this receivable of $923,761.45, the sum of $899,-722.26 had already been paid to and received by Petitioner." (Italics added.) The figure set forth in the "report"—$923,761.45, instead of $24,039.19—must have staggered the superior court judge, as it did this writer. The commissioner does not deny the truth of the Rhode Island company's *verified* amendment, but seeks to avoid the matter by claiming inability to obtain the records from the company. To make the erroneous allegation—presented even as a "question"—without foundation or proof is an instance not only of capricious, arbitrary conduct but of lack of good faith.

The *record* in this case demonstrates that the seizure referred to in the majority opinion is the result of the personal and official disapproval by the California commissioner of one of the officers of the Rhode Island Insurance Company rather than fear that the company was or might become insolvent.

I am convinced that on the merits of the demurrer, or upon consideration of all of the pleadings, or upon the good faith test as set forth in the majority opinion, an order should issue setting aside the order of seizure, without prejudice to the commissioner, if there is good cause therefor, and instituting

a form of procedure that would not accomplish the certain destruction of the California business of the company and irreparable injury to its agents as well as to more than 140,000 policyholders in California.

Petitioner's application for a hearing by the Supreme Court was denied February 16, 1950. Schauer, J., voted for a hearing.