UNITED STATES of America, Appellee,

v.

Bert KIMMEL, Appellant.

No. 161, Docket 25834.

United States Court of Appeals Second Circuit.

Argued Nov. 30, 1959.

Decided Jan. 20, 1960.

Frederick H. Block, New York City (Robert B. Block, New York City, on the brief), for appellant.

James G. Starkey, Asst. U. S. Atty., S. D. New York, New York City (S. Hazard Gillespie, Jr., U. S. Atty., Otis Pratt Pearsall, Asst. U. S. Atty., S. D. New York, New York City, on the brief), for appellee.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Appellant was convicted by a jury for using the mails to defraud in violation of section 1341 of Title 18 United States Code. From the judgment of conviction appellant appeals, assigning as errors: (1) submission to the jury on insufficient evidence; (2) reception in evidence of work-papers of a deceased accountant;

and (3) various rulings by, and a portion of the charge of, the trial judge. Specifically, Kimmel was charged with knowingly mailing a false financial statement on October 17, 1953 to Credit Exchange, Inc. for the purpose of obtaining credit. Appellant concedes that the figures were false. He urges that the government failed to prove his knowledge of their falsity and that the statement was mailed for the purpose of obtaining credit.

For some years prior to 1953 Kimmel had been engaged in a retail sportswear business under the name of Rita's. Between January and September of 1953 Kimmel sought and obtained several loans in addition to purchasing merchandise on credit. On or about September 15 Kimmel requested an additional loan from Abraham Gewirtz,[1] his millionaire landlord. Gewirtz's accountant, Richardson, was not satisfied with the financial figures shown to him at this time. Kimmel stated that his accountant had resigned and asked Richardson to bring the books up to date. Richardson replied that he would do so as Gewirtz was interested in the financial position of the business. Richardson assigned William Mohrsfelder,[1] a member of his staff, to this job.

From September 16 to October 9 Mohrsfelder worked at Rita's on a "write-up job" (the posting of books from available records without verifying the accounts). He had to rely on Kimmel to provide him with all unpaid invoices. On October 9 Mohrsfelder submitted to Richardson a balance sheet showing accounts payable as $9,794.74 (the government proved as at least $25,-928.13) and notes and taxes as $12,527.-30 (the government proved as at least $20,576.24). His work sheets for accounts payable listed 37 creditors (the government proved a total of 57).

Shortly thereafter a meeting was held between Kimmel, Mohrsfelder, Gewirtz, and Martin Gewirtz (a nephew of Abra-ham Gewirtz, referred to as "Martin"). On looking over the balance sheet and work sheets of Mohrsfelder, Gewirtz questioned Kimmel and Mohrsfelder as to how the accounts payable were arrived at. They stated that Kimmel had given all the bills to Mohrsfelder. Subsequently, it was decided that Martin would invest $15,000 for a 30% interest in an incorporation of Rita's. On October 13 Rita's Accessories, Inc. (Rita's) was formed; Kimmel was named as president and Martin as vice president and treasurer. The following day Kimmel executed a stockholders' agreement, as president and in his individual capacity, in which he warranted the accuracy of the balance sheet.

On October 15 Kimmel asked Richardson to fill out the credit form employed by Credit Exchange, Inc. Using the same figures, Richardson completed the statement, dated it October 13, and returned it to Kimmel. Kimmel signed it and mailed it to Credit Exchange, Inc. on October 17. In reliance upon these figures they recommended Rita's for credit up to $500.[2] In January 1954 two sellers extended credit to Rita's on the basis of this recommendation.

Shortly after incorporation Kimmel had to submit several checks to Martin for his signature. These were in payment of monthly installments most of which were not listed on the balance sheet. When Martin evinced some concern, Kimmel assured him his corporate interest would be credited for them.

Early in November 1953, Kimmel hired an accountant, Arthur Grossman, on a part-time basis. One of Grossman's duties was to pay bills as evidenced by invoices. Noticing that the dates had been altered on some of the bills, he questioned Kimmel and was told that they were post-dated or were for shipments which arrived after the dates on the invoices. Sometime in December 1953 Grossman discovered a wad of invoices,

---

[1]. Appellant uses "Moersfelder" and "Gewirtz"; the government "Mohrsfelder" and "Gewirtz."

[2]. Prior to receiving this balance sheet Credit Exchange, Inc. was not recommending Rita's for credit in any amount.

including some with changed dates, lying on a shelf. On confrontation Kimmel showed no surprise and told him they were bills which would eventually be paid, again explaining that they were post-dated or dated prior to receipt of the merchandise. Grossman, not satisfied with these answers, told Martin about them. Kimmel's explanation to Martin was that the manufacturers must have erred in the dates of payment and that they would be paid. A day or two later at a meeting between Gewirtz, Grossman, Martin and Kimmel, Kimmel merely shrugged his shoulders when Gewirtz angrily inquired why these invoices had not been previously brought to his attention.

Between the incorporation on October 13, 1953 and subsequent bankruptcy on March 12, 1954, Kimmel repeatedly sought loans from Gewirtz, who yielded on two occasions, lending $2,500 after the meeting concerning the bills discovered by Grossman, and the same amount in January or February 1954.

The record overwhelmingly establishes Kimmel's personal familiarity with the debts of Rita's not included in the financial statement mailed to Credit Exchange, Inc. Two of the creditors, not listed in the accounts payable, had been dunning him for overdue payments during September and October 1953. A loan for $5,000 had been obtained in September, first installment to be paid October 15, and on October 14 Kimmel had acknowledged this debt to Martin. Checks for two bank notes which were being paid in monthly installments were submitted for Martin's signature shortly after the incorporation. The repeated requests for loans prior to and after incorporation indicate knowledge of Rita's financial structure.

The events surrounding Martin's investment belie Kimmel's plea of ignorance. In order to obtain Gewirtz's approval of this investment by his nephew, Kimmel realized that the financial structure of Rita's must appear basically sound. Mohrsfelder had to rely on him for the production of all unpaid bills.

That Kimmel inadvertently overlooked many of these invoices when he represented to Gewirtz that he had given all of them to Mohrsfelder is implausible in light of the alteration of dates (for which different explanations were given), his lack of surprise on the finding of the wad of bills by Grossman, and his inability to give a satisfactory explanation to Gewirtz.

Although the primary purpose of these financial machinations was to promote the investment by Martin, a further benefit was sought when the statement containing these figures was mailed to Credit Exchange, Inc. At the top of this form appears the following paragraph:

"I (We) give you below a statement of my (our) assets and liabilities taken from my (our) books, reflecting the financial condition of my (our) business as of the date appearing below, based upon actual inventory taken and submitted for the purpose of obtaining credit or insurance through your agency for the benefit of all subscribers and future subscribers whom you do or may serve. * * *"

And directly above the signature:

"The above full and correct statement of my (our) financial condition is made to form a basis for credit with subscribers of Credit Exchange, Inc."

Appellant claims that this was just a routine announcement of the change to a corporate status. He fails, however, to explain how such an announcement would be beneficial to the corporation absent a possible recommendation for credit to its subscribers. Neither of the firms which later extended him credit on the basis of the credit recommendation, given after the false balance sheet had been submitted, would have done so had it not been made. Again, the proven financial straits of the corporation, the many loan requests, and the eventual bankruptcy are indicative of a contrary conclusion.

■ Appellant also urges error in the introduction of the balance sheet and

work sheets of Mohrsfelder (who died prior to the trial) as business entries under section 1732, Title 28 United States Code. This section provides for the admissibility of "any writing * * * made as a memorandum or record of any act, transaction, occurrence, or event, * * * as evidence of such act, transaction, occurrence or event, if made in regular course of business * * *" All other circumstances affect only the weight it should be given. These papers were properly received under this section as "evidence" of the "event," viz., the audit by Mohrsfelder. Kimmel's role in their compilation was proven by other evidence.

 The court received in evidence as a business entry a copy of the stockholders' agreement which had been conformed and kept in the regular course of business by the law firm where it was prepared and executed. Appellant first objected on the ground that it was not the original. However, the best evidence rule does not apply to business entries under section 1732. On cross examination of an employee of the law firm appellant developed that the first page of a guaranty agreement by Mrs. Kimmel was missing. This guaranty was wholly collateral to the main agreement. On a motion by appellant to strike the document as incomplete the court queried: "Would you like to have the defendant produce the original?" Appellant then asked for a mistrial which was denied; however, at appellant's request the court instructed the jury on the defendant's right not to produce any documents.

■■ The incompleteness of a business entry was a fact to be weighed by the jury. Here it was of little significance. The court's question was prompted by the cumulative objections of appellant. The instruction given by the court relating to self-incrimination was more than fair. Since Kimmel had signed the agreement both as an individual and as a corporate officer there is no privilege against self-incrimination. Wilson v. United States, 1911, 221 U.S. 361, 31 S. Ct. 538, 55 L.Ed. 771; Christianson v.

United States, 8 Cir., 1955, 226 F.2d 646.

■ There remains one further assignment of error. Appellant contends that the charge as to character evidence did not adequately cover the subject. This claim is groundless. The court charged that "it alone could have the effect when considered in connection with other evidence, of generating a reasonable doubt of his guilt when such doubt would not otherwise exist." The court then continued by saying that it must be weighed with all of the facts. This is a proper statement of the law.

Judgment affirmed.