**UNITED STATES of America**
**v.**
**Stewart B. HOPPS and Robert Hopps.**
**Criminal No. 25360.**

United States District Court
D. Maryland.
Dec. 20, 1962.

738

Joseph D. Tydings, U. S. Atty., and J. Hardin Marion, III, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Edward P. Morgan, Washington, D. C., and Thomas J. Kenney, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

The indictment in this case charges that Stewart B. Hopps (Hopps) and his son Robert, as part of a scheme to defraud,[1] knowingly caused to be delivered by mail to addressees in Maryland in February 1958, a brochure which falsely represented the financial condition of International Guaranty and Insurance Company (International), a corporation of Tangier, Morocco, which Hopps dominated, supervised, managed and controlled.

Hopps has now moved, pursuant to Rule 41(e), F.R.Crim.P., to suppress as evidence against him in this proceeding: (I) all documents, papers and other property belonging to him "taken or obtained from the office of U. S. Marine and Foreign Securities, Ltd. (a Delaware corporation) and Stewart B. Hopps, personally, at 417 Montgomery St., San Francisco, California," in April 1958 "by representatives of the Insurance Department of the State of California, and subsequently obtained by the United States Attorney at Baltimore, Maryland, by subpoena duces tecum or otherwise"; and (II) all his property taken from a similar office at 44 Wall Street, New York City, in February 1960 by representatives of the Attorney General of New York and subsequently obtained by the United States Attorney.[2]

I. The California papers were taken by representatives of the California Insurance Commissioner, pursuant to the order of a California State Court which appointed him conservator of International and directed him to take possession of all the books, records, etc. of that

1. In violation of 18 U.S.C.A. § 1341.

2. A third paragraph refers to tampering with his mail, but has not been pressed.

A similar motion has been filed by Robert Hopps, but this opinion will deal only with the motion of Stewart Hopps.

company. The ultimate question here is whether the use of those papers in the instant case would violate any right of Hopps under the Fourth, Fifth or Fourteenth Amendments. To answer that question we must consider: Whether there was a search and/or seizure within the meaning of Rule 41(e) and the Fourth Amendment, and if so, whether the search and seizure were unreasonable and unlawful; whether Hopps has standing to contest the alleged search and seizure; and whether Hopps has waived any right he might otherwise have had to complain of the alleged search and seizure. These questions in turn depend largely upon the answer to still other questions, namely: the nature of the California proceeding; whether the papers belonged in whole or in part to Hopps, to International, or to some other corporation; whether the office where they were found was the office of International; whether they were delivered by or taken with the consent of an attorney for International; whether that attorney also represented Hopps at the time; and whether Hopps should be considered to have acquiesced in the taking of some or all of the papers.

II. The New York papers were delivered to representatives of the Attorney General of that State pursuant to a subpoena issued by him under sec. 352 of the General Business Law of New York, McKinney's Consol.Laws, c. 20 (Blue Sky Law) to Loretto C. Lindhauer, who was or had been Hopps's private secretary and was at that time the manager and sole occupant of the New York office used by Hopps and various corporations in which he was interested. The questions presented are generally similar to those raised in connection with the California papers.

At the hearing on the motions Hopps and other witnesses testified and many exhibits were offered, including a transcript of the California proceeding through August 1960, a transcript of the New York proceeding, correspondence and other papers covered by the motions.

The findings below are based upon the evidence presented and the inferences drawn from that evidence after considering the credibility of the several witnesses, some of whom, including Hopps, did not tell the whole truth.

## BACKGROUND FACTS

Stewart B. Hopps (Hopps) has had wide experience in the insurance business. For many years he has specialized in reinsurance and so-called surplus lines, which may be placed with non-admitted carriers subject to varying regulations in the several States.

A number of alien insurance companies, in addition to the Underwriters at Lloyds of London, write American risks, usually through holders of master binding contracts, and many of them have established trust funds of one kind or another in the United States to secure payment of American losses and to comply with the requirements of certain States. Some of these alien companies are substantial organizations, owned in whole or in principal part by aliens; others are less substantial, owned and operated by Americans and used by them to avoid the admission requirements of the several States, as well as for tax reasons.

Many years ago Hopps was United States Manager for a well-known British company, but for some time before the summer of 1957, he had been acting as broker and agent for various insurers, using a number of corporations which he owned directly or indirectly and which he operated with the assistance of a corps of employees, nominees, puppets and associates, who were shifted from the payroll of one company to another as business and tax considerations dictated. Among the corporations so controlled and operated by Hopps were: U. S. Marine & Foreign Securities, Ltd. (U. S. Marine); Anglo-Canadian Underwriters (Anglo-can), incorporated in Newfoundland, but doing business out of offices in California, New York, Alabama and Rhode Island; American Armed Services Underwriters (AASU); Oreana Corporation (Ore-

ana); and Sierra Underwriters, Inc. (Sierra).

Hopps also "advised" various insurance companies for a fee. His testimony sought ·to emphasize that phase of his activities, but the desired emphasis can be accepted only if the word "advise" is given a meaning to include "manage" and "operate".

U. S. Marine also dealt in the stock of small insurance companies which Hopps bought for himself (always or usually in the name of nominees) or for associates. Hopps did not expect to make money through dividends, but through brokerage commissions, agency commissions, and fees for "advice" to and operation of the companies in which he was interested, a number of which developed financial and other difficulties. See e. g. Rhode Island Insurance Company v. Downey, 95 Cal. App.2d 220, 212 P.2d 965.

It is hard to tell from the present record the nature of the relationship of Hopps to Atlas Insurance Company of Alabama, which went into receivership in July 1957. Some of the Hopps corps had been active in its management, and in December 1956 Atlas had entered into a spread loss treaty of reinsurance with International, which then had as its corporate name West Indische Herverzekering Maatschappij. After the receivership of Atlas, Hopps arranged that West Indische should take over the two Atlas lines in which he was particularly interested, namely, the business which had been placed with Atlas by Anglo-can and the business placed by Nationwide Underwriters, Inc., a brokerage concern operated by one Herbert Oppenheim.

It is also hard to tell when Hopps first became connected with West Indische and what his relationship thereto was before the latter part of 1957. West Indische's legal home office was in the banking house of Mars et Cie, in Tangier, but little if any business appears to have been transacted there except formal meetings and the keeping of certain corporate records. The ownership of its stock in early 1957 is not clear. Hopps testified that the principal equitable owner was a Spaniard named Ferrar, who lived in Cuba but is now dead. Hopps denied any stock ownership, but the papers which are the subject of the motion and are in evidence include one which shows that Hopps owned some founders' shares, and one of the *administrateurs* (directors) of West Indische was E. S. Van Galder, clearly an alias and equally clearly one of the Hopps corps. In October 1957, when Hopps needed assets for himself or Ehrlich to contribute to the Nevada trust hereinafter referred to, West Indische purchased $85,000 preferred stock of U. S. Marine (the common stock of which was owned by Hopps), giving in payment a mortgage for $85,000 which was held by West Indische. The assignment was executed by Van Galder. The name of West Indische was changed to International Guaranty and Insurance Company in the fall of 1957, and it will be convenient to refer to that corporation as "International" throughout this opinion. In 1957 Anglo-can, one of the corporations owned or controlled by Hopps, had a master binding contract with International covering the whole of North America.

## THE CALIFORNIA PAPERS— FACTS

Hopps had operated out of New York City until about 1950, when he moved to San Francisco and opened an office there. In 1957–58 his chief office was at 417 Montgomery Street, San Francisco, which was rented in the name of U. S. Marine. Hopps testified that he contributed to the rent in such proportions as his tax advisers suggested. He retained his New York office, at 44 Wall Street, and from both of the offices he operated or directed the operation of various corporations, including U. S. Marine, Anglo-can, AASU and Sierra. International paid the rent of both offices for two months (February and March) in 1958, under the circumstances discussed below.

In the early summer of 1957 two well-known Californians suggested to Hopps that he find a company that would insure

small mortgages. After studying the problem and conferring with Henry North, a vice president of Metropolitan Life Insurance Co., Hopps arranged that International should write the business. He caused to be incorporated in Nevada, Mortgage Corporation of America (MCA), which was to be owned one-quarter by Hopps, one-quarter by his attorney Ehrlich, and one-half by the two men who suggested the idea. MCA was given a master binding contract by International, but its original purpose failed, because the two mortgage men decided to place their business elsewhere.

Shortly thereafter J. Kenneth Edlin, of Miami, Fla., who with McAdams, an attorney, and Van Wagner, both from Chicago, Ill., was connected in various ways with a number of savings and loan associations and with operators of others, discussed with Hopps the insurance (1) of deposits in such associations, (2) of the liabilities of directors thereof, and (3) of mortgage lines. It was agreed that such business would be placed with International through MCA, and that the stock of MCA would be issued one-half to Edlin and McAdams and one-half to Ehrlich and Hopps. At the same time it was proposed that two-thirds of the stock of International be purchased on the same basis. Hopps undertook to arrange for the purchase of the International stock and did whatever may have been necessary. An office for MCA was opened in Nevada, and five policies were issued to savings and loan associations through MCA. The physical work in connection therewith was done by the Hopps corps partly in Nevada, partly in California. A few mortgage policies may also have been issued. In October 1957 a $200,000 trust fund was established with a Nevada bank to secure International's American obligations. The Chicago interests contributed a mortgage or mortgages valued at $102,900, and Ehrlich contributed the $85,000 mortgage which had moved swiftly from International to U. S. Marine for stock and from U. S. Marine to Ehrlich for what is said to have been a fee. The accrued interest on this mortgage and a

check from Mrs. Hopps made up the intended $100,000. Hopps also put in an additional check for $2900 at the last minute at Edlin's insistence. This was a minor irritant in a series of disputes between Hopps and Edlin, which resulted in Edlin's withdrawal from MCA and the reorganization of that company near the end of 1957 on the basis of a 40% stock interest in the name of Ehrlich, 40% in McAdams and 20% in Van Wagner. Also in December 1957, it was agreed that 4950 out of the 5000 shares of International should be purchased from their then owners and issued 40% to Ehrlich, 40% to McAdams and 20% to Van Wagner.

The relationship between Hopps and Ehrlich is complex. Ehrlich served both as counsel and as nominee for Hopps at different times. Ehrlich had no insurance experience, but good connections in California. Hopps had the insurance experience, but as a result of various difficulties with insurance commissioners, particularly in California, see Rhode Island Insurance Co. v. Downey, 95 Cal.App.2d 220, 212 P.2d 965, he was anxious to hide his connection with any non-admitted carrier. The most reasonable inference is that Ehrlich was holding the stock of MCA and the stock of International partly for himself and partly for Hopps.

Ehrlich was elected or appointed general counsel of International. As such he received much of the mail addressed to International in San Francisco, all of which he sent to 417 Montgomery Street. There Hopps or his staff prepared the replies, which were sent to Ehrlich for his signature. Hopps and his staff also prepared for Ehrlich's signature as general counsel most of the letters that went out in International's name. Interoffice communications and communications to members of the Hopps corps and associates were generally prepared at 417 Montgomery Street and signed individually by Hopps or by others.

In December 1957 or January 1958 the Nevada office of MCA was closed because of action taken by the Insurance Commis-

sioner of the State against MCA and Sierra for failing to comply with Nevada law. The office was moved to 417 Montgomery Street, and the trust assets were transferred to the Pacific National Bank of San·Francisco, where a "home-office type" trust was established temporarily, with the intention that a "U. S. dollar" trust with individual trustees would be promptly substituted therefor.

When the contract for the purchase of the International stock had been executed and appropriate action taken in Tangier, Robert Hopps brought the certificates to Chicago, and on January 31, 1958, McAdams delivered some $700,000 additional mortgages to the Pacific National Bank, bringing the total assets of the trust to a figure over $1,000,000, so that International could qualify on the Illinois approved list of non-admitted carriers. This qualification was necessary before Illinois brokers could legally charge commissions on certain lines of business placed with the company. The stock transfer was dated as of December 31, 1957.

Meanwhile the business of Nationwide Underwriters, which International had taken over from Atlas, was causing a lot of trouble. Nationwide had its office in Arizona, but because Hopps considered Oppenheim financially untrustworthy, all of the business was reported to the office at 417 Montgomery Street, San Francisco, where rates were checked, policies approved, and one of the Hopps corps countersigned checks on the bank account in which Nationwide's premiums were deposited. Anglo-can received an overriding commission on Nationwide's business. Contrary to instructions from Hopps, Oppenheim undertook on behalf of International to insure some California risks. This precipitated or accelerated an investigation by the California Insurance Commissioner early in 1958 to determine whether International was doing business in California in violation of the California Insurance Code. See § 1580 et seq. See also § 700.

While that investigation was progressing, Hopps continued to plan the organization of International's business, including the organization of the master binding contract holders which would operate out of Chicago and San Francisco. Until the Illinois Commissioner would place International on the approved list of non-admitted companies, it was necessary to write business though an agency located elsewhere, and Hopps selected Maryland as the most liberal state. Accordingly, in January 1958 International Guaranty and Insurance Underwriters of Maryland (IGI Underwriters) was incorporated in Maryland with the same 40–40–20 ownership as MCA. IGI Underwriters had an office in Silver Spring, Maryland, staffed by members of the Hopps corps. It wrote surplus, casualty and hard to place fire lines, from late January 1958 to May 1958. This business was supervised and directed by Hopps and the Hopps corps principally from the San Francisco office, with copies of almost everything going to the New York office, in accordance with Hopps's general practice.

A commercial checking account in the name of International was opened in the Pacific National Bank in San Francisco. That bank also held the trust assets.

In February 1958 an Illinois corporation, McAdams-Van Wagner, Inc. (McAVW), also owned 40–40–20, was incorporated. It took over the savings and loan and mortgage lines from IGI Underwriters in March 1958, after the Illinois Commissioner had placed International on the approved list. McAVW wrote three policies on savings and loan associations in March 1958, one in April and one in May, and during those months it also wrote several mortgage schedule contracts and large director indemnity guarantees. McAVW made no daily or monthly reports to the San Francisco office and did not make the required reports to Ehrlich as the Chairman of the Trustees of the United States Dollar Trust, no doubt because of the conserva-

torship proceeding which was instituted on April 3, 1958.

The new trust had been set up in February 1958 to replace the home-office type trust which had been moved from Nevada to San Francisco around the first of January. The trustees were J. Howard McGrath, of Washington, D.C., Walter Humkey, of Miami, Fla., McAdams, Van Wagner, North and Ehrlich, the Chairman. A question later arose whether all of the trustees had accepted their trusteeships and signed the final trust agreement, but that question is not important here. The trustees were to receive $6,000 a year, plus legal fees, etc. Some of them were selected for their political influence, and communications from Hopps made it clear that they were expected to use that influence. Although the trust consisted of mortgages and other assets supposed to be worth over $1,000,000, the trust agreement provided that money might be withdrawn from the trust to pay not only the expenses of the operation of the trust but also all the commissions and expenses incurred by International in connection with the production or handling of its American policies, provided the corpus of the trust was not reduced below $500,000. The trustees met early in March 1958 in San Francisco, contacted political friends, including the Attorney General of California, and adjourned to a nearby resort, at considerable expense to the trust.

As part of the plan outlined by Hopps to his associates in February 1958, IGI Underwriters was to be "to all intents and purposes, similar to the home office operation of an insurance company".[3] Accordingly, on February 27, 1958, steps were taken to put this decision into effect, including the issuance by IGI Underwriters of checks in payment of the full rent for the office at 417 Montgomery Street, San Francisco, and for the office at 44 Wall Street, New York, and the salaries of members of the Hopps corps, including Robert Hopps, who manned or

worked out of the San Francisco, New York, and Maryland offices. McGrath received a $5,000 attorney fee. Certain advances made by Mrs. Hopps on behalf of U. S. Marine to pay old debts of International were refunded to U. S. Marine. The money to make these checks good was taken out of the trust account.

By the middle of March the Insurance Commissioner had gathered sufficient information to indicate that International was conducting an insurance business in California out of the Hopps office at 417 Montgomery Street. Late in March someone from the office of the Attorney General of California told Ehrlich that they were about to bring a proceeding in the name of the Insurance Commissioner to have the Court appoint a conservator of International, on the ground that it was doing business in California in violation of the applicable statute. Ehrlich requested that the action be held off and promised that not more than $10,000 would be withdrawn from the trust pending negotiations. Nevertheless, $50,000 was withdrawn on or about March 28, of which some $10,000 was sent to IGI Underwriters to pay rent, salaries, and other expenses of International and its agents at San Francisco, Silver Spring, Maryland, and elsewhere.

When the Insurance Commissioner heard of these withdrawals, he insisted that the conservatorship proceedings be filed promptly. This was done on April 3, 1958, in the Superior Court of San Francisco County. On the Commissioner's verified application, a part of which was alleged on information and belief, a judge entered an order: stating that it appeared to the court from the application that International, an alien insurer within the meaning of sec. 1581 of the Insurance Code, had transacted and was continuing to transact insurance business in California without making the deposit with the proper public officer for the benefit and security of policyholders and creditors in the United States, as re-

---

3. See Hopps memo of February 11, 1958, to Ehrlich, McAdams and Van Wagner, and the letter of February 27, 1958, from Gotz (Cal.) to Corbett (Md.), both members of the Hopps corps, requesting the issuance of certain checks.

quired by secs. 1581–1599 of the Insurance Code; and vesting all International's rights, title and interest in and to its assets, wherever situate, in the Insurance Commissioner; appointing the Insurance Commissioner conservator of International, its business, assets and affairs; directing the Commissioner forthwith to take possession of all the books, records, property, real and personal, and assets of respondent insurer, wherever situate, and to conduct as conservator the business of International or so much thereof as to him might seem appropriate; enjoining the individual respondents "Stewart T. (sic) Hopps, Robert Hopps, Nadine J. Offenback, Ida Strombach, Robert Gotz, J. W. Ehrlich, William Corbett, Harold C. Redlick and Stanley Borgenight" [4] from transacting International's business or disposing of any of its property or assets until the further order of the court; granting other relief appropriate in the circumstances; and directing that all the individual respondents make available to the conservator, in order that he might be able to perform his statutory duties as conservator, all books and records, insurance policy contracts, binders and other papers relating to the business of International in their custody, control and possession, and in addition thereto all such records revealing agency and brokerage affairs concerned with International. A final paragraph authorized the conservator to initiate such legal or administrative action or actions in California or other states as might appear to him necessary to carry out his functions as conservator.

The same afternoon a representative of the Insurance Commissioner called at 417 Montgomery Street, found only two or three subordinate members of the Hopps staff present, and was told that there were no records of International there. That evening and the next day, Hopps and some of his staff, selected certain records of International which had been kept in the office at 417 Montgomery Street, packed them into cartons, and two or three of the staff took them to Phoenix, Arizona. The same day, i. e. the day after the order was signed, Hopps and Ehrlich consulted with Lloyd Dinkelspiel, of the law firm of Heller, Ehrman, White and MacAuliffe, of San Francisco, which had represented Hopps for many years in various matters, including claims by and against him personally in receivership proceedings of insurance companies. Eugene S. Clifford, another member of the firm, was then representing Hopps actively in one such matter, a claim arising out of the Inland Empire receivership. Hopps and Ehrlich engaged that firm, and particularly Dinkelspiel and Clifford, to represent International in the conservatorship proceedings. I also find, despite the denial of Hopps and the evasion of Clifford, that the firm was supposed to look out for Hopps's personal interests as well.

Hopps testified that he was never served in the conservatorship proceeding. There is testimony that he was, but no clear evidence that he was served has been presented. In any event, he was not served before April 15, 1958.

A hearing was held in the California court on April 8 and 9, at which one of the Hopps staff testified, as well as Ehrlich. On April 10 a press release was issued by the Attorney General and the Insurance Commissioner, with the approval of Dinkelspiel, stating that International's management had agreed to give the Commissioner full access to the records of that company, wherever located, and had announced their intention to permit full disclosure of the affairs of the company to the insurance officials charged with the supervision of insurance.[5]

The next day Wickstrom, the deputy insurance commissioner in charge of the

---

4. All were members of the Hopps corps.

5. As we have seen Hopps had been acting in effect as International's management. Whether or not he authorized the statement in the press release, he must have known about it before or shortly after it was made, and did not object.

case, told Dinkelspiel that they wished to go to the Hopps office at 417 Montgomery Street and pick up whatever records of International might be there. It was arranged between Wickstrom and Dinkelspiel that when the representative of the conservator arrived at the office Dinkelspiel would send someone over promptly to check the records with him. Miro and Weise, from the office of the Insurance Commissioner, arrived at 417 Montgomery Street, on April 14, early in the morning. Shortly thereafter, Clifford arrived, sent by Dinkelspiel, and Miro and Clifford together examined the file cabinets in the large outer office and the vault. Clifford testified that he considered it a part of his responsibility to see that they did not rummage through Hopps's personal files. They did not go into the small, private office used by Hopps personally, which was part of the suite, nor did they take anything from the desk used by Robert Hopps and the accountant Borgenight.

One filing cabinet had a card with the legend "International Guaranty and Insurance Company" on the outside. After a brief look at the files contained therein, Miro said that he wished to take the entire contents. Clifford also looked at those files and did not object. Where other file drawers carried labels with names which meant nothing to Miro, who had participated in the previous investigation of International's business, he did not bother with them, but where a file drawer bore a name which was familiar to him as a result of the previous investigation or where a drawer had no name on the outside, Miro, without objection from Clifford, opened the drawer and looked at the names on the file jackets. Clifford then examined the files and, at Clifford's request, Miro agreed not to remove a number of the files. Miro examined the other files, but did not take away anything from any drawer except the International drawer and the unmarked drawers. Some papers which seemed to belong to International, or which Miro thought might belong to it, were found in baskets on some of the

desks; these were taken, along with a notebook from a stenographer's desk and some rubber stamps for printing the name of International, found in the vault. The visit occupied a day and a half, and some papers were removed each day, April 14 and 15.

■ Clifford offered no objection. The government contends that all of the files were taken with Clifford's consent. He testified, in effect, that he did not voluntarily deliver the files, but felt that under the court order the conservator was entitled to the records of International, although he did not concede that the order had been properly entered. I find that Clifford, as the representative of International, under the compulsion of the court order, consented to the search of the outer office, and that he did not object to the representative of the conservator taking any of the files, records, correspondence and other papers which were removed.

■ The fact that Clifford was there to see that only the papers of International were taken by the representatives of the conservator is evidence that the papers taken did belong to International. However, Clifford's judgment is not binding on Hopps.

After considering all of the evidence and having examined a large number of the papers, I find that the material taken from 417 Montgomery Street falls into two classes: (1) papers taken from the file drawer marked International Guaranty and Insurance Company, and (2) papers found elsewhere.

(1) The files in the drawer marked International Guaranty and Insurance Company divide into two sub-classes: (a) files marked 1958, and (b) pre-1958 files.

(a) All or almost all of the former are files of International, containing many letters to the Company and copies of replies thereto prepared by Hopps or by others of his staff under his direction for signature by Ehrlich as general counsel, or for signature by members of the Hopps staff. Substantially all of these

papers deal with the business of International, whether they are written to or from the company itself or to or from one of its agents. This is natural, because during the first part of 1958 the Hopps office was directing International's affairs as though it were the home office operation of an insurance company. As we have seen, in February Hopps recommended that this function be carried on by IGI Underwriters in Maryland, and some checks were signed there, but the Maryland operation was at all times under the full and specific direction of Hopps and his staff at 417 Montgomery Street, San Francisco.

(b) Most of the files containing correspondence before 1958 were originally files of Anglo-can, U. S. Marine, AASU, MCA, and other corporations owned or controlled by Hopps which had master binding contracts with International (under that name or when it was known as West Indische), or acted as brokers or agents of one kind or another in connection with International's business. Some dealt with the business which was taken over by International after the receivership of Atlas in the summer of 1957. The most reasonable inference is that all such files dealing specifically with International's business had been gathered together and filed in alphabetical order along with the 1958 files in the International drawer. During the last half of 1957 at the latest, the Hopps office at 417 Montgomery Street was the equivalent of the United States office of an alien insurer, if not to all intents and purposes a home office operation. Hopps was in charge of the operations of International in the United States and Canada, and managed those operations through his staff and his corporations, for himself and the other owners of International.[6] Some of the 1957 files may originally have been the property of Hopps and his corporations, other than Inter-

national, but International had no other detailed record of many of the transactions, and International's interest in the files was recognized when they were merged with the International files in the one drawer.

■ A number of Hopps's personal papers seem to have been misfiled in that drawer. The circumstances were such that the presence of those papers in the files taken by Miro did not change the basic nature of the files as files of International, and did not render the search or the taking unreasonable.[7] The government has agreed that it will not offer in evidence in this case any of the personal papers found in these files which do not deal with the business of International.

(2) Many of the papers found on desks or in other files in the outer office are clearly the property of International. Others are similar to the various classes of pre-1958 papers found in the drawer marked International. They were examined by Clifford before they were taken, and he offered no objection to their taking. Their status will be determined below, in the discussion.

■ Hopps testified that he did not know what was taken until sometime in 1962. Of course, he did not know every paper that was taken, but he must have known at least generally what was removed, because his secretary prepared a list of the files at the time of the taking. I further find Hopps was in touch with Dinkelspiel and Clifford, and that he did not object to what Clifford had done. The reason for Hopps's failure to object is apparent. He was anxious to secure a dismissal of the conservatorship proceedings, by negotiation if possible, and if not, by a motion attacking the jurisdiction of the California Court. No demand for the return of the papers was ever made by Hopps. He says that he

6. Some work, of course, was also done for the persons who were negotiating for the purchase of most of International's stock.

7. This point will be developed in the discussion below.

spoke to Clifford about it, but that Clifford told him that the proceedings were going so satisfactorily for the corporation that he did not want to create any disturbance.

In June 1958 International moved for an order vacating and setting aside the order appointing the conservator, challenging the jurisdiction of the court and the facts upon which the original order had been obtained. After hearing and consideration of many papers which had been filed, the motion was denied, and an order was entered in the fall of 1958, terminating the business of International in California and appointing the Insurance Commissioner its liquidator. All claims filed in the proceeding were paid in full.

In March 1960 an order was entered directing the Insurance Commissioner, the liquidator, to return the papers to International. Shortly thereafter, while the papers were still in the hands of the Insurance Commissioner, subpoenas were issued out of the United States District Court for the District of Maryland directed to the Insurance Commissioner and to Clifford, as attorney for International, calling on them to produce the records in this Court for use in the criminal trial involving Commercial Savings and Loan Association and certain individuals connected therewith. In May 1958 the conservator had permitted postal inspectors from Baltimore to examine all of the records which he had obtained from the Hopps office. Clifford wrote the United States Attorney in Baltimore that they did not object to the subpoenas as such but felt the subpoenas were too broad. Clifford, therefore, filed a petition in the United States District Court for the Northern District of California, where a judge modified the subpoenas. The State Court also modified its previous order that the papers be returned to International. Thereupon, the records requested were shipped to the District of Maryland and have been in the custody of the United States Attorney for this District ever since.[8] They were used at the criminal trial of Commercial, and it is presumed that some of them were used before the grand jury in obtaining the indictment in the instant case. Neither the Insurance Commissioner nor International nor the California State Court nor anyone else objected to the transmission of the papers pursuant to the subpoenas, after they had been made more definite on application to the United States District Court for the Northern District of California.

## THE CALIFORNIA PAPERS— DISCUSSION

### The Subpoena

█ Counsel for Hopps argues that under the California statute and the order of the California Court appointing the conservator, the conservator had no title to the records and other papers of International[9] but only the right to take possession of them, and that under such cases as Blum v. State, 94 Md. 375, 51 A. 26, 56 L.R.A. 322, and Manning v. Mercantile Securities, 242 Ill. 584, 90 N.E. 238, 30 L.R.A.,N.S., 725, the naked possessory interest of the conservator rendered the property in his control immune from use in a criminal prosecution.[10] There is no merit to this argu-

---

8. It seems clear that they were transmitted to this District pursuant to the subpoena addressed to the Insurance Commissioner.

9. As distinguished from the assets of International, as to which the conservator took title. See Order of Court summarized in the statement of facts above. The distinction in the Order is based upon the applicable California statutes.

10. The California Insurance Code contains a provision in sec. 12924, granting subpoena power to the Commissioner, and providing "(b) A person shall not be excused from testifying or from producing any book, document, or other thing under his control upon any such hearing or investigation on the ground that his testimony, or the book, document, or other thing required of him, may tend to incriminate him, or may have a tendency

ment, which is fully answered by the decision of the Supreme Court in Dier v. Banton, 262 U.S. 147, 43 S.Ct. 533, 67 L.Ed. 915. See also Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919; In re Bob, 2 Cir., 76 F.2d 131; United States v. Hoyt, S.D.N.Y., 53 F.2d 881.

There can be no objection to the use of the papers subpoenaed in the instant case unless such use would deprive Hopps of his rights under the Fourth or Fifth Amendment. Hopps claims deprivation of such rights on the ground that all or most of the papers belonged to him and not to International, and that the papers were in the hands of the conservator as the result of an unlawful search and seizure. The subpoena neither adds to nor substracts from any such rights that Hopps may have.

### Standing

██ The Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth Amendment. Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782; Elkins v. United States, 364 U.S. 206, 213, 80 S.Ct. 1437, 4 L.Ed.2d 1669; Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Federal and California decisions alike hold that evidence obtained as the result of an unlawful search and seizure by State officials is inadmissible in a criminal proceeding in either a Federal or a California Court against one having standing to object. Elkins v. United States, supra; Mapp v. Ohio, supra; United States v. Peisner, 4 Cir., 311 F.2d 94, November 5, 1962; People v. Cahan, 44 Cal.2d 434, 445, 282 P.2d 905, 911, 50 A.L.R.2d 513.

██ Under the principles stated in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, and Henzel v. United States, 5 Cir., 296 F.2d 650, 653, I conclude that Hopps has standing to attack an allegedly unlawful search and seizure at the 417 Montgomery Street office, of his own papers or of the papers of a corporation, such as U. S. Marine, which he and his wife substantially owned. Henzel goes further in this respect than Jones. Although the reasoning in Henzel is not set out in detail, it seems to make the answer to the problem turn upon the substance of the relationship of the defendant to the corporation in the particular case. This is in accord with Schwimmer v. United States, 8 Cir., 232 F.2d 855, 861, where Judge Johnson said: "The constitutional safeguard against unreasonable searches and seizures is more than a reach at mechanics in process. It is concerned with intrinsic as well as extrinsic aspects, and its look is at reality, not theory, in respect to the whole of what is being done." I conclude that under the unusual circumstances of this case, Hopps also has standing to attack an allegedly unlawful search and seizure at that office of papers of Anglo-can, MCA, AASU and the other corporations which he owned or controlled. Whether he also has standing to attack an allegedly unlawful search and seizure of papers of International is very doubtful, since he did not own even a majority of its stock. That question, however, need not be decided here, because even if Hopps had standing to challenge the taking of the papers of International, he would also have to show that they were taken unlawfully. Neither Jones nor Henzel was intended to overrule the general principle that an of-

to subject him to a punishment for a felony or misdemeanor; but no person shall be prosecuted or punished by any criminal action or proceeding for or on account of any act, transaction, matter or thing concerning which he is so compelled to testify under oath, except for perjury committed in such testimony." This provision, however, has no applica-

tion to this case, since the Commissioner was not proceeding under sec. 12924, but under sec. 1010 et seq. Moreover, Hopps was not compelled to testify under oath. This section neither helps nor hurts any rights Hopps may have with respect to the papers removed from 417 Montgomery Street.

ficer of a corporation cannot object to the use in evidence in a criminal case against him of corporate papers unless he shows not only that he has standing to raise the question but also that they were taken unlawfully. See United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; United States v. Kimmel, 2 Cir., 274 F.2d 54; United States v. Guterma, 2 Cir., 272 F.2d 344; United States v. H. J. K. Theatre Corp., 2 Cir., 236 F.2d 502; Schwimmer v. United States, 8 Cir., 232 F.2d 855; Lagow v. United States, 2 Cir., 159 F.2d 245; United States v. Onassis, S.D.N.Y., 133 F.Supp. 327; United States v. Onassis, D.D.C., 125 F.Supp. 190, 191; Wigmore on Evidence, McNaughton Revision, Vol. VIII, § 2264.

■■■ We come then to the questions whether there was a search and seizure at 417 Montgomery Street, and if so whether the search and seizure was unlawful. In deciding these questions we must distinguish between the rights of International and the rights of Hopps. In determining whether there has been an unreasonable search and seizure by State officials, the Federal Court must make an independent inquiry. The test is one of federal law, and federal standards must be applied. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669.

### Search

■■■ Under the facts which have been found above there was a search of the outer office and vault at 417 Montgomery Street. The search was permitted by Clifford, as attorney for International, pursuant to the agreement made between his partner Dinkelspiel and Deputy Insurance Commissioner Wickstrom. Since International was then paying the rent for the office, and its business was being conducted there, Clifford had the right to authorize the search for papers belonging to International, of which the Insurance Commissioner had the right to possession. United States v. Sferas, 7 Cir., 210 F.2d 69. See also Davis v.

United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453. Clifford did not have the authority to authorize a search for papers belonging to any individual or other corporation, even if they related to International's business, and the court order did not authorize any such search. However, the search which was made was a bona fide search for papers and records of International. Under the facts of this case, the entry on the premises and the search for International's papers, to which the conservator was entitled to possession under the court order, was not unlawful.

### Seizure

■■■ Clifford examined all papers which Miro wished to take, refused permission as to some, but did not object to Miro's taking any of those which were removed. In view of the fact that Clifford was faced with the court order, his failure to object to Miro's taking the papers did not amount to a completely voluntary consent to the taking. Cf. United States v. H. J. K. Theatre Corp., 2 Cir., 236 F.2d 502. Nevertheless, since the court order authorized the conservator to take possession of the papers and records of International, and directed the respondents to turn them over to him, the taking of the papers, so far as the rights of International are concerned, was not a seizure within the meaning of the Fourth Amendment and Criminal Rule 41(e), provided the court order was valid. For which see (1), immediately below. Moreover, in view of the failure of International or its counsel then or thereafter to object to the taking (except so far as they sought to vacate the entire order of the California Court for lack of jurisdiction), the acquiescence of Clifford was sufficient to prevent any successful attack now being made on the basis of any violation of International's rights, as distinguished from any rights which Hopps may have.

With respect to any individual rights of Hopps, we must consider three classes of papers, (1) the papers of Internation-

al, (2) the papers of Hopps himself, and (3) the papers of other corporations, all with regard to the temporal and other categories established in the statement of facts above.

▮▮▮▮ (1) With respect to the papers of International, there was no seizure within the meaning of the Fourth Amendment and Rule 41(e) if the order of the California Court was valid. The proceeding in the California Court was a civil proceeding, brought under sec. 1011 of the Insurance Code. The constitutionality of such proceedings has been sustained. Neblett v. Carpenter, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182; Rhode Island Insurance Co. v. Downey, 95 Cal. App. 220, 212 P.2d 965. The fact that the original order was passed on the ex parte application of the Insurance Commissioner is not fatal. See State Savings & Commercial Bank v. Anderson, 165 Cal. 437, 132 P. 755, L.R.A.1915E, 675. The facts alleged in the sworn application were sufficient to support the order which was entered. That order plus the agreement with International's counsel was sufficient to justify the search and the removal from the office of all papers belonging to International, but it did not justify the removal of the papers of any other corporation or of any individual who had not consented to the search.

(2) With respect to any papers belonging to Hopps himself there was a seizure as well as a search. Since the search was not made incident to a valid arrest, the use against Hopps of any papers belonging to him can only be sustained if there was either (a) a valid search warrant, or (b) consent, or (c) if the then conservator found any instruments of a crime as distinguished from evidence of a crime, in the files which were turned over to him pursuant to the Court order.

(a) The facts which had been developed during the investigation showed that the California statutes were probably being violated at 417 Montgomery Street; the facts would have been sufficient to obtain a valid search warrant, if the State had decided to proceed criminally rather than civilly. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697. Nevertheless, no effort to obtain a search warrant was made, either before the Court order was obtained, or thereafter under the provision in the order authorizing the conservator to take such legal action as might be necessary to carry out his functions.

(b) Did Hopps consent to the taking? The facts set out above show that the Heller firm, and particularly Dinkelspiel and Clifford had represented Hopps personally in various matters, that Hopps and Ehrlich engaged them in this matter to represent International, and that the firm undertook to look after the interests of Hopps as well, although it did not formally represent him in the proceeding. The principal interest of Hopps at that time was to get International out of the conservatorship. Dinkelspiel agreed on April 10 that International's records would be turned over to the conservator, and agreed on April 11 that if the conservator would send his representatives to 417 Montgomery Street, Dinkelspiel would send a representative there to check what they wished to take. Clifford, who was sent, knew that he was supposed to prevent a general rummaging through Hopps's files, and he did prevent it. He did not object to Miro taking any of the files actually taken, although he successfully objected to others being removed. Hopps's private secretary kept a record of what was taken, and it is incredible that Hopps did not learn from her and from Clifford generally what files had been removed. And, as we have seen, Hopps has never made any demand on the conservator for the return of any of the files or other papers.

▮▮▮ I conclude that Hopps consented to the taking under the order of all files belonging to International, and of all files of whatever origin which had been

placed in the drawer marked with International's name.[11]  He should not be held to have consented to the taking of any purely personal papers which had been misfiled therein, nor to the taking of any papers which did not belong to International and which were taken from the top of desks or file cabinets other than the drawer marked International.

**(c)** If in the course of the search, which was not unlawful, the representatives of the Insurance Commissioner found or removed any papers which were in fact the instruments or means of committing a crime, as distinguished from evidence of a crime, they had the right to retain such papers, whether the crime involved was the crime they were investigating, or some other crime.  Abel v. United States, 362 U.S. 217, 237, 238, 80 S.Ct. 683, 4 L.Ed.2d 668; Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Rees, D.Md., 193 F.Supp. 849, 854.

**(3)** With respect to any papers which may have belonged to corporations other than International, there was also a seizure as well as a search.  But although Hopps has standing to raise any rights which he himself may have with respect to such papers, he may not rely on the possible rights of the respective corporations.  "When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment * * *."  Lagow v. United States, 2 Cir., 159 F.2d 245, 246, quoted with approval in United States v. Guterma, 2 Cir., 272 F.2d 344, 346.

No Fifth Amendment rights of Hopps were violated with respect to the California papers.  He was not required to testify in the case nor required to produce any of the papers.  Any privilege against their production rests upon the manner of their taking, a Fourth Amendment question, discussed above.  Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919; In re Bob, 2 Cir., 76 F.2d 131; United States v. Hoyt, S.D.N.Y., 53 F.2d 881.

## THE CALIFORNIA PAPERS— RULING

For the reasons stated above, the motion to suppress must be denied with respect to:  (1) all papers found in the drawer marked with International's name (except purely personal papers of Hopps not related to International's business), and (2) all papers belonging to International or other corporations, wherever found in the office at 417 Montgomery Street and removed on April 14–15, 1958.

If the government contends that any of the purely personal papers of Hopps were the instruments or means of committing the crime charged, this Court will consider each such paper separately, if and when it is offered.  The Court will reserve its ruling with respect to the ultimate disposition of those papers.[12]

## THE NEW YORK PAPERS—FACTS

In 1959 the Attorney General of New York initiated, pursuant to sec. 354 of Article 23–A of the General Business Law of New York (Martin Act), an inquiry into the practices of certain savings and loan associations in the issuance, sale, promotion, negotiation, advertisement and distribution within and from the State of New York, of securities, and particularly of savings and loan association certificates of ownership which were being sold or offered for sale with representation that the deposits in said savings and loan associations were commercially insured.

As part of said inquiry, the Attorney General applied for and received from the Supreme Court of New York County on November 24, 1959, an order directing

---

11. For a statement of the reasons why some files had been placed in that drawer, see the statement of facts above.

12. I understand that no purely personal papers of Hopps not related to International were found outside the drawer marked with International's name.

Stewart B. Hopps, Loretto C. Lindhauer and most of the other members of the Hopps corps, as well as International, the trustees of its dollar trust, and others, to appear and produce certain records before the Supreme Court of New York County on January 13, 1960.

Miss Lindhauer was served with a copy of that Court order and supporting documents on November 30, 1959. She was a member of the Hopps corps; she had been Hopps's personal secretary until the death of McCarthy, a Hopps associate, in early 1959; thereafter she had been, in effect, office manager of the office of Hopps and U. S. Marine at 44 Wall Street, New York, and was then on the payroll of Anglo-can, which used that office, as did the other Hopps companies. She had custody of the records there, but did not own any of them.

Miss Lindhauer appeared in Court on January 13 and 27, 1960, and was examined under oath, in accordance with the practice in such cases, but did not produce any books, records or other documents pursuant to the Court order of November 24, 1959.

On January 27, 1960, pursuant to sec. 352 of Art. 23–A of the General Business Law, Miss Lindhauer was served with a subpoena duces tecum, addressed to her alone, commanding her to appear before the Attorney General at 80 Center Street, New York, on February 8, 1960, "to testify what you and each of you may know in regard to matters relating to the practices of Utah Savings & Loan Association and others in the issuance, sale, promotion, negotiation, advertisement, distribution or purchase of securities in and from the State of New York and bring with you the following books and papers, which the Attorney General deems relevant and material to the inquiry: your correspondence files re Utah Savings & Loan Association, City Savings Association, Arizona Savings & Loan Association, and other savings and loan associations; and your correspondence files pertaining to International Guaranty and Insurance Company."

When first summoned by the Court order of November 24, 1959, Miss Lindhauer communicated with Hopps, who advised her to consult his New York attorneys. They, in turn, suggested that she consult her attorney, David Marcus.[13] Sometime between January 27 and February 8, 1960, Miss Lindhauer again communicated with Hopps and advised him of the proceedings and her subpoena to produce records. Hopps advised her to comply with her counsel's advice.

In accordance with that advice, Miss Lindhauer packed certain records of International, and records of Hopps and other Hopps companies "pertaining to" International. On the morning of February 8 Marcus telephoned David Clurman, the Special Assistant Attorney General who had issued the subpoena, and advised Clurman that the records which Miss Lindhauer had been commanded by subpoena to produce were ready for delivery in the office which she occupied at 44 Wall Street, New York City. Marcus asked that a representative of the Attorney General be sent there to transport the records to the office of the Attorney General. A representative was dispatched; he picked up the records and delivered them to Clurman. Miss Lindhauer appeared before Clurman the same day and identified the records against a list she had prepared. Beyond that, she gave no testimony in the sec. 352 proceeding.

No search was conducted of the 44 Wall Street office, and no books, records, papers, documents, or other materials were seized at the premises. No one, including particularly any one purporting to represent Miss Lindhauer, International, Hopps, or U. S. Marine, ever requested any modification, interpretation or · clarification of the subpoena duces tecum served upon Miss Lindhauer on

13. Another attorney came with her when she was summoned by the government to testify before me on the pending motion and advised her to claim the benefit of the Fifth Amendment with respect to every question which was put to her.

January 27, 1960, nor ever demanded or requested that the records produced by Miss Lindhauer be returned to him or anyone else by the Attorney General. Most of the papers so produced by Miss Lindhauer were contained in correspondence files marked with International's name, but in which were mingled letters and copies of documents, some of which appear to belong to International, some to Hopps and some to U. S. Marine, MCA and the other corporations through which Hopps operated. Some of the letters were addressed to the New York office, or were carbon copies of letters which appear to have been written there by various members of the Hopps corps, including Miss Lindhauer herself. The other papers include copies of letters written elsewhere and sent contemporaneously to the New York office to complete its files. Some appear to have been removed from the California office. All of the papers appear to be related to the subject of the inquiry being conducted by the Attorney General.

The inquiry of the Attorney General has continued and is continuing up to the present. The records produced by Miss Lindhauer have been and are relevant and material to the inquiry. The records so produced are now and have always been available to any proper person for inspection or copying. The records were sent to the District of Maryland pursuant to a subpoena duces tecum issued at the request of the United States Attorney in the instant case and served upon "Authorized Representative, Bureau of Securities, Department of Law, State of New York", calling for the production of "all files, books, records, correspondence and papers of or pertaining to International Guaranty Insurance Company (sic), U. S. Marine and Foreign Securities, Stewart B. Hopps, and Robert Hopps now in your possession or held by others under your direction or control." The records had on a previous occasion been subpoenaed by the United States Attorney for use in the Commercial case and thereafter returned.

## THE NEW YORK PAPERS— DISCUSSION

As in the case of the California documents, the subpoena duces tecum which issued out of this Court neither adds to nor subtracts from any rights which Hopps may have under the Fourth or Fifth Amendments to object to the use against him in a criminal case of the papers delivered to the Attorney General of New York by Miss Lindhauer pursuant to the subpoena addressed to her by the Attorney General.

Sec. 352 of Art. 23–A of the General Business Law of New York, under which the subpoena of January 27, 1960, addressed to Miss Lindhauer, was issued by the Attorney General, has been held to be constitutional, as well as the earlier proceedings under sec. 354. Dunham v. Ottinger, 243 N.Y. 423, 154 N.E. 298; People v. Federated Radio Corp., 244 N.Y. 33, 154 N.E. 655; People ex rel. Kenny v. Adams, 292 N.Y. 65, 54 N.E.2d 10. The testimonial compulsion provided by sec. 352 was linked with the corresponding grant of immunity, in sec. 359, which will be discussed below, in connection with defendant's Fifth Amendment points.

### Standing

Hopps has standing, of course, to raise any Fifth Amendment points he may have. Under the authorities cited in discussing the California papers, he has standing to raise any rights he himself may have under the Fourth Amendment with respect to all the papers delivered by Miss Lindhauer to the Attorney General, except possibly the papers belonging to International itself, which will be discussed separately. Unlike California, New York had not by February 1960 adopted the exclusionary rule, but Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, requires this Court to test under Federal constitutional principles the authority and means by which the Attorney General of New York acquired and holds the papers.

### Fourth Amendment

■■ Hopps argues that the subpoena addressed to Miss Lindhauer on January 27, 1960, was so broad as to constitute an unreasonable search and seizure under Federal standards. We must consider the breadth of the subpoena in the light of the purpose and scope of the investigation being carried on by the Attorney General. He was investigating a matter of great public concern, the increasing practice of savings and loan associations to advertise and distribute in New York and elsewhere securities in the form of deposits supposed to be adequately insured by commercial insurance companies.[14] The various corporations which used the office at 44 Wall Street, as well as Hopps himself, were known to have been active in the business of one of the few insurance companies which wrote such business. The Attorney General was, therefore, justified in issuing a broad subpoena seeking information about that type of business as well as individual instances of such insurance and the character of the insurer.

■ Hopps further complains because the subpoena calls on Miss Lindhauer to produce "your" correspondence files, contending that none of the files were hers. She was, however, the manager of the office at 44 Wall Street, who sent and received many letters and cables in her own name, was then on the payroll of Anglo-can, and was the only occupant of the office at 44 Wall Street except when Hopps or some of the Hopps corps visited it from time to time in connection with the business of the several corporations. She was undoubtedly the custodian of all the records, having a measure of control, more than bare possession, though less than ownership, with respect to all of them.

The Court must consider the fact that after repeated conversations with Hopps, his lawyers and her lawyer, she had no difficulty in determining what records—files measuring about 15 inches in depth—should be delivered pursuant to the subpoena.

■ (a) Almost all of the files carry the heading International Guaranty and Insurance Company, with a subhead showing the correspondent or nature of the contents. Although the connection of Hopps with International after June 1958, and indeed the activities of International after that date are far from clear on the present record, it does appear that Hopps did not own or control International at that time. Under all the circumstances, including developments after April 15, 1958, Hopps does not have standing to raise any Fourth Amendment points with respect to the papers belonging to International which were delivered by Miss Lindhauer to the Attorney General pursuant to the subpoena.

■ Many of the papers pertaining to International which might be considered to have been the property of Hopps originally, have been mingled with papers and records of International and other corporations in such fashion that they should now be considered, and I find, that they are the property of International or such other corporation. Some of them appear to be papers which were removed from the California office to the New York office.

(b) Any papers delivered by Miss Lindhauer to the Attorney General which belonged to Hopps personally must be suppressed unless Hopps consented to their delivery. If Miss Lindhauer, through spite, had delivered them voluntarily to the Attorney General they would be useable against Hopps, but the delivery in this instance was not voluntary, but under the compulsion of the subpoena.

■ Although Hopps knew of the issuance of the subpoena and must have

---

14. Some of the savings and loan associations are only nominally such associations, as appears from several cases in this Court. See e. g. Securities & Exch. Comm. v. American Internat'l Sav. & Loan Ass'n, D.Md., 199 F.Supp. 341.

known what Miss Lindhauer had decided to do, he did not contest the subpoena himself either before or after the delivery, and has never until this motion claimed any of the papers as his own. This is strong evidence that the papers which appear to belong to International and the other corporations do in fact belong to them, but it does not amount to a consent by Hopps to the delivery pursuant to the subpoena of any of his personal papers.

(c) With respect to the papers belonging to corporations other than International, the legal principles which apply to the similar California papers apply here. Hopps has standing to raise his own rights, but may not rely on any Fourth Amendment rights of the respective corporations. See cases cited above.

*Fifth Amendment and Statutory Immunity*

■ A too broad subpoena may in certain circumstances violate Fifth Amendment rights, but under the circumstances of this case, discussed above in connection with the Fourth Amendment, the subpoena was not unreasonably broad.

As we have seen, the constitutionality of sec. 352 has been held to depend upon the grant of immunity provided by sec. 359, which reads in pertinent part as follows:

"Upon any investigation before the attorney-general or his deputy or other officer designated by him, or in any criminal proceeding before any court, magistrate or grand jury, pursuant to or for a violation of any of the provisions of this article, the attorney-general, his deputy or other officer designated by him, or the court, magistrate or grand jury, may confer immunity * * *."

This Court may assume, without deciding, that if Hopps had testified or produced any documents himself pursuant to a subpoena issued under sec. 352, such

testimony and documents could not be used against him in this case under the circumstances and means by which they have been brought to this District, whether or not such imagined testimony or documents might be useable against him if other legal process or procedures had been used.

But Hopps did not testify in the New York proceedings nor produce any documents there pursuant to a subpoena. He does not come within the provisions of sec. 359.

Hopps contends, however, that the New York proceeding was directed against him and that the subpoena was addressed to Miss Lindhauer in order to avoid his immunity rights under sec. 359. If so, it would be so fundamentally unfair as to violate his constitutional rights.

■ This contention of Hopps must fail, because neither of the grounds relied on by him is supported by the weight of the evidence. The investigation was a bona fide investigation directed to the protection of the public from investing in securities of dubious character, and Hopps and his corporations were incidental. The reasons why the subpoena was properly addressed to Miss Lindhauer have also been developed above. Far from rushing into the proceedings to protect his rights, Hopps was content to allow Miss Lindhauer to bear the heat of the battle in New York. Hopps has never entered those proceedings and has never been forced into them in violation of any of his Fifth Amendment rights.

THE NEW YORK PAPERS—RULING

For the reasons stated above, the motion to suppress must be denied with respect to the papers delivered by Miss Lindhauer to the Attorney General of New York, except the personal papers of Hopps, not "pertaining to International Guaranty and Insurance Co.". As to those personal papers it will be granted.